IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE,<br>100 N. Holliday St,<br>Baltimore, MD 21202,<br><br>and<br><br>ECONOMIC ACTION MARYLAND FUND,<br>2209 Maryland Avenue<br>Baltimore, MD 21218<br><br>*Plaintiffs*,<br><br>vs.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU,<br>1700 G Street NW<br>Washington, DC 20552,<br><br>and<br><br>RUSSELL VOUGHT, in his official capacity as Acting Director of the Consumer Financial Protection Bureau,<br>725 17th St NW<br>Washington, D.C. 20503,<br><br>*Defendants*. | Case No. |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Since Congress created the Consumer Financial Protection Bureau ("CFPB") in the wake of the 2008 financial crisis, the agency's opponents have tried repeatedly to abolish it through legislation in Congress and legal challenges in the Courts. *E.g.*, H.R. 2937 - Repeal CFPB Act (118th Cong.); *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020). These attempts have failed.

The Trump administration—acting through Defendants CFPB and its Acting Director, Russell Vought—now seeks to do by fiat what opponents of the CFPB were unable to do in Congress or the courts. Specifically, Defendants seek to use the CFPB's statutory funding mechanism, by which it draws funds directly from the Federal Reserve System of which it is a part, *see* 12 U.S.C. 5491, 5497, to effectively defund the CFPB and leave it unable to carry out its congressionally mandated mission and specific statutory responsibilities.

Defendants have already announced their intention not to draw additional funds for the CFPB, claiming that the agency's existing operating reserves are sufficient. Now Defendants are poised to transfer away those operating reserves, leaving the CFPB defunded and dead in the water.

That action is unlawful under the Administrative Procedure Act. It is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because it is designed to and in fact will leave the CFPB with insufficient funding to carry out its statutorily required functions. And it is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right because the CFPB Director is statutorily required to request transfer of an amount "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law," 12 U.S.C. 5497(a), and has no authority or discretion to unilaterally defund the agency.

Plaintiffs the City of Baltimore and Economic Action Maryland Fund—like many others across the country—rely on the CFPB and would be irreparably harmed by Defendants' unlawful action. To protect the services that they rely on and that Congress provided when it created the CFPB, Plaintiffs allege as follows:

## Parties

1. Plaintiff Mayor and City Council of Baltimore, Maryland ("Baltimore") is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in Maryland and the thirteenth largest city in the United States.

2. Plaintiff Economic Action Maryland Fund ("Economic Action") is a statewide nonprofit movement of individuals and organizations that advances economic inclusion and financial justice through research, advocacy, consumer education, and direct service. Its direct service programs support Maryland households struggling with housing, economic security, medical debt, and more.

3. Defendant Consumer Financial Protection Bureau ("CFPB") is a federal financial regulatory agency headquartered in Washington, D.C. It is charged with administering federal consumer protection laws and regulating a broad swath of consumer financial products and services.

4. Defendant Russell Vought is the Acting Director of the CFPB. He is sued in his official capacity.

## Jurisdiction and Venue

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), because Plaintiffs the City of Baltimore and Economic Action Maryland Fund reside in this district.

**Legal Framework**

7. The Consumer Financial Protection Bureau was established in the wake of the 2008 financial crisis by the Consumer Financial Protection Act ("CFPA"), which is Title X of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

8. Congress transferred to the CFPB significant powers from other regulatory agencies as well as broad responsibilities over the market for consumer financial products or services. Congress's purpose in establishing the new agency was to consolidate oversight of the consumer market so that the new agency could address the problems that had led to the financial crisis as well as ensure the vigorous enforcement of federal consumer laws going forward.

9. The CFPA broadly tasks the CFPB with "seek[ing] to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. 5511(a).

10. The CFPA also requires the Director to establish and oversee a number of specific offices and functions within the CFPB. For example, it requires that the Director "shall" establish a research office "whose functions shall include researching, analyzing, and reporting on" the consumer financial marketplace. 12 U.S.C. § 5493(b)(1).

11. It requires that the Director "shall" establish a community affairs office "whose functions shall include providing information, guidance, and technical assistance" relating to consumer products "to traditionally underserved consumers and communities." 12 U.S.C. § 5493(b)(2).

12. Similarly, it requires the Director "shall" establish an office for collecting and tracking consumer complaints, an Office of Fair Lending and Equal Opportunity, Office of Financial Education, an Office of Service Member Affairs, and an Office of Financial Protection for Older Americans. 12 U.S.C. § 5493(b)(3), 12 U.S.C. § 5493(c), (d), (e), (g).

13. Each of these offices is required by statute to carry out certain responsibilities, including reporting to Congress, coordinating with state and federal agencies, and delivering specific services directly to the American people—for example, "establishing a single, toll-free telephone number, a website, and a database or utilizing an existing database to facilitate the centralized collection of, monitoring of, and response to consumer complaints." 12 U.S.C. § 5493(b)(3)(A).

14. The CFPA imposes numerous other specific requirements on the Director and the CFPB. The agency, for example, "shall monitor for risks to consumers in the offering or provision of consumer financial products or services" "[i]n order to support its rulemaking and other functions," 12 U.S.C. § 5512(c)(1), and "shall publish not fewer than 1 report of significant findings of its monitoring required by this subsection in each calendar year," 12 U.S.C. 5512(c)(3).

15. The CFPA also directs the agency to "require reports and conduct examinations on a periodic basis" of supervised entities, 12 U.S.C. § 5514(b)(1), and "to establish … reasonable procedures to provide a timely response to consumers" who submit complaints, 12 U.S.C. § 5534(a).

16. The statute requires that the CFPB's student loan ombudsman "shall" "receive, review, and attempt to resolve informally complaints from borrowers" of student loans, to

5

analyze data on those complaints, and make recommendations to Congress and executive branch officials. 12 U.S.C. § 5535.

17. The enumerated consumer laws, a defined set of consumer financial statutes including the Truth in Lending Act and Equal Credit Opportunity Act, likewise require specific actions by the CFPB.

18. The Home Mortgage Disclosure Act, for example, requires mortgage lenders to collect and report information about applications for mortgage loans to the CFPB, 12 U.S.C. 2803(h)(1), and directs that the Bureau "shall provide staff and data processing resources" to an interagency body known as the Federal Financial Institutions Examination Council in order to allow for compilation, analysis, and publication of the collected mortgage data, 12 U.S.C. 2809(a).

19. The CFPB is part of the Federal Reserve System, 12 U.S.C. § 5491, and is funded through transfers administered by the Board of Governors of the Federal Reserve System, 12 U.S.C. § 5497.

20. The Board of Governors makes these transfers on a quarterly basis in "the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)." 12 U.S.C. § 5497(a)(1).

21. The Board of Governors has no discretion to refuse a transfer request from the Director, nor to provide a different amount than the Director requests.

22. The amount the CFPB may draw annually is subject to a cap that is adjusted annually to account for inflation. 12 U.S.C. § 5497(a)(2). During fiscal year 2024 this cap was

$785.4 million. During that year, the CFPB requested and received from the Federal Reserve Board four transfers totaling $729.4 million.

23. "Federal consumer financial law" is a defined term that encompasses the consumer law that the CFPB is charged with administering, including the CFPA. 12 U.S.C. § 5481(14).

24. The Supreme Court confirmed that the CFPB's statutory funding mechanism meets the requirements of the Appropriations Clause in *CFPB v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024).

25. As a matter of responsible fiscal management, the CFPB maintains an operating reserve in order to meet unexpected expenses and ensure continuity of funding. At the end of fiscal year 2024, the CFPB had a total Treasury account balance of approximately $200 million.

**Factual Allegations**

26. On February 7, 2025, President Trump named Office of Management and Budget Director Russell Vought as the Acting Director of the CFPB.

27. The Trump administration in general and Defendant Acting Director Vought in particular have made no secret of their desire to dissolve the CFPB.

28. Prior to serving in the Trump-Vance administration, Vought was an architect of the Heritage Foundation's Mandate for Leadership, Project 2025, which calls for abolishing the CFPB, asserting that the agency is "highly politicized, damaging, and utterly unaccountable."

29. Vought moved quickly to hamstring the Bureau and its operations after being named Acting Director.

7

30. On February 8, the day after he became Acting Director, Vought instructed CFPB employees via an all-hands email to "[s]tand down from performing any work task."

31. That same day, Vought notified the Board of Governors that, as Acting Director, he was requesting $0 for the third quarter of fiscal year 2025.

32. Vought's letter implied that the Bureau would be able to rely on a purported reserve balance of $711,586,678 to continue carrying out its authorities during the third quarter of fiscal year 2025.

33. The letter also indicated that the Bureau's reserve fund was neither required by statute nor necessary to fulfill the Bureau's mandate.

34. Vought closed the letter by, among other things, committing to "cut this excessive [reserve] fund." Later on X, Vought noted with regard to the reserve fund that, "This spigot, long contributing to CFPB's unaccountability, is now being turned off."

35. The next day, Sunday, February 9, the Bureau's Chief Operating Office emailed all CFPB employees informing them that the Bureau's D.C. headquarters would be closed from February 10 through February 14.

36. Also on February 9, Vought said that the CFPB has been "a woke and weaponized agency against disfavored industries and individuals for a long time."

37. This week, President Trump confirmed that he plans to close down the Bureau, which he stated "was set up to destroy some very good people."

38. During a White House press conference, Trump said the CFPB was "very important to get rid of."

39. On February 10, after Vought announced that the CFPB would not be drawing funds for the third quarter in light of its supposed reserves of $711 million, Elon Musk posted

on social media, "CFPB has $711M? That money should be returned to taxpayers."[1] Days earlier, on February 7, 2025, Mr. Musk had posted "CFPB RIP" to social media and commented in a reply to the post that CFPB "need[s] to go."[2]

40. Defendant Vought has said that he intends to cut off the CFPB's funding, which comes directly from the Federal Reserve. On information and belief, Defendant Vought is seeking to transfer the Bureau's reserve fund back to the Federal Reserve.

41. By requesting $0 from the Federal Reserve for the upcoming quarter of the Fiscal Year and attempting to transfer the Bureau's reserve fund to the Federal Reserve, Defendant Vought intends to deprive the Bureau of operating funds.

42. Without any operating funds, the Bureau will be unable to perform its statutorily mandated functions or continue its other work. Those functions were transferred to the CFPB from numerous other agencies, at least one of which (the Office of Thrift Supervision) no longer exists.

**Harm to Plaintiffs**

43. Baltimore is the largest city in Maryland, with a population of over 600,000. According to the 2020 Census, 60 percent of Baltimore's population is Black, 27 percent is White, 8 percent is Hispanic or Latino, and 2.5 percent is Asian. Five percent of the City was identified by the Census as being of two or more races. Many residents of the City of Baltimore have historically experienced unfair lending and consumer practices.

---

[1] https://x.com/elonmusk/status/1889005419273638392
[2] https://x.com/elonmusk/status/1887979940269666769

44. Among its other missions, the Baltimore City Law Department has responsibilities to protect Baltimoreans from predatory business practices of all kinds, including misleading practices, unfair and deceptive practices, and discrimination in lending.

45. For example, historic consumer protection legislation passed in 2023 updated the city's consumer protection ordinance and gave the Law Department important new powers to take action against companies who harm Baltimore citizens through unfair, deceptive, and abusive practices.

46. Representatives of the Law Department have active accounts with the CFPB consumer complaint database, which it accesses to understand the issues facing the people of Baltimore and to obtain information regarding potential predatory practices that affect the economic wellbeing of the city and its residences.  Staff for the City of Baltimore have attended trainings put on by the CFPB to stay abreast of current issues in consumer protection and fair lending in order to be able to serve the people of the City.

47. In addition, CFPB's vigorous enforcement efforts and its oversight of federal consumer protection laws provides an invaluable complement to Baltimore's efforts to protect its residents from scams and abuse. Without CFPB, people in Baltimore would be more at risk of being tricked and trapped by shady financial practices, and the city would be forced to divert resources from other essential functions just to provide the same level of protection that residents enjoy now. Moreover, without the CFPB, Baltimore would be deprived of important information regarding potential predatory practices and consumer protection efforts that it has used to best serve the people in its boundaries.

48. Plaintiff Economic Action provides direct assistance to individuals, including with programs that support Maryland households with medical debt, economic security, housing, and other matters.

49. Economic Action's Securing Older Adult Resources (SOAR) program supports older adults' economic security, in part, by providing direct consumer education on financial exploitation and common scams. As a part of this effort, Economic Action has used the CFPB's educational materials to inform older adults about scams and to encourage them to submit complaints to the Bureau.

50. Economic Action also works to support consumers facing challenges related to medical debt, an issue that affects a significant share of people in Maryland. Economic action provides resources to individuals as a part of its medical debt efforts, including its *Guide to Medical Debt*, which recommends that consumers who are victims of illegal and abusive debt collection tactics file complaints with the Bureau.

51. Helping people submit complaints to the CFPB to address problems with financial scams, debt collection, medical debt, fair housing, and other issues has been an important tool supporting Economic Action's work.

52. Without the CFPB's complaint database, Economic Action's work would be significantly impaired, and it would be required to devote more resources and more counselors' time to achieve the same results for the people it serves. Resolving issues with banks and debt collectors, for example, is more difficult when only an individual consumer is involved and the private entity is not receiving the consumer's complaint from a government agency.

53. The CFPB's complaint database is also important for multiple areas of Economic Action's work, as the CFPB's release of anonymized and redacted complaints allows Economic Action to identify emerging problems that can have serious consequences for consumers here in Maryland. Economic Action uses the complaint database to better understand issues that are particularly prevalent for Maryland consumers.

54. Further, Economic Action relies on other resources provided by the CFPB, including the information and data about mortgage loans that the CFPB collects and publishes under the Home Mortgage Disclosure Act ("HDMA"). HMDA requires lenders to report loan-level information about mortgages and mortgage applications, which the CFPB then compiles, analyzes and publishes. That information in turn helps Economic Action and groups like it to understand trends in the mortgage market, including identifying potential fair lending issues or where lenders are just failing to meet the housing needs of their communities. Economic Action uses this information to inform both its advocacy and direct service work.

55. There is no replacement available for the CFPB's HMDA database. No other source has such comprehensive or authoritative information about consumer mortgage lending. If the database were taken down or compromised in a way that prevented Economic Action from relying on it, that would directly interfere with Economic Action's ability to help borrowers and to advocate for fairer housing policies.

56. If the CFPB were defunded and unable to continue to operate its complaint system, to make available information such as the HMDA data, and to provide its many consumer education resources, Economic Action would have no choice but to either cut back on

its existing work providing direct services to consumers or divert resources from other core parts of our mission.

57. Economic Action would further harmed if the CFPB was not carrying out its vital enforcement actions involving many of the laws that protect the people Economic Action serves. Defunding the CFPB would lead to more of the very types of scams and abuses that Economic Action works to help people prevent and address.

## Claims for Relief

### COUNT ONE
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### (All Defendants)

58. Plaintiffs reallege and incorporate by reference the paragraphs written above.

59. Under the Administrative Procedure Act, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. 706(2)(C).

60. Returning the CFPB's existing funding reserve to the Federal Reserve Board, combined with Acting Director Vought's requesting $0 in funding for the next quarterly transfer is final agency action from which legal consequences will flow.

61. Because the CFPB has no source of operational funding besides quarterly transfers and its reserves, this action (requesting $0 in funding and transferring the existing reserve) will leave the CFPB without access to operating funds once it spends the funds it received for the second quarter of Fiscal Year 2025.

62. That final agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because it is designed to and in fact will leave the CFPB with insufficient funding to carry out its statutorily required functions.

63. Defendants' action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" because the Director is statutorily required to request transfer of an amount "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. 5497(a). An amount that leaves the Bureau unable to carry out its statutorily required functions is, by definition, not an amount "reasonably necessary to carry out the authorities of the Bureau."

64. For these reasons, Defendants' unilateral defunding of the CFPB is unlawful.

## COUNT TWO
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### (All Defendants)

65. Plaintiffs reallege and incorporate by reference the paragraphs written above.

66. Defendants' decision, on information and belief, to transfer the Bureau's reserve fund back to the Federal Reserve, is final agency action which is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law in light of Defendants' prior decision to request $0 in funding for the next quarterly transfer. 5 U.S.C. § 706(2)(A).

### Prayer for Relief

Plaintiffs request that the Court enter the following relief:

  a. Declare the defunding of the CFPB to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. 706(2)(A) and

in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

b. Temporarily, preliminarily and permanently enjoin Defendants and all of their officers, employees, and agents from taking any steps to unilaterally defund the CFPB, including transferring the Bureau's reserve funds or otherwise using them for a purpose other than the operation of the Bureau;

c. Set aside and hold unlawful the defunding decision;

d. Award Plaintiffs their costs, reasonable attorney's fees, and other disbursements as appropriate; and

e. Grant such other relief as the Court deems necessary, just, and proper.

Dated: February 12, 2025                                Respectfully submitted,

/s/ *Mark B. Samburg*

Mark B. Samburg
Kevin E. Friedl*
Daniel McGrath*
Jessica Anne Morton*
J. Sterling Moore*
Robin F. Thurston*
Skye L. Perryman*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
msamburg@democracyforward.org
kfriedl@democracyforward.org
dmcgrath@democracyforward.org
jmorton@democracyforward.org
smoore@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

**Pro hac vice* application forthcoming