IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, et al., <br><br> *Plaintiffs*, <br><br> vs. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU, et al., <br><br> *Defendants*. | Case No. 25-cv-458-ABA |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER**

Ever since the Consumer Financial Protection Bureau was created in the wake of the 2008 financial crisis, opponents of the CFPB have tried various schemes to eliminate the agency or at least undermine its effectiveness. These efforts, which have included proposals to abolish the agency in Congress and legal campaigns seeking to declare the agency unconstitutional and invalid in full, have been unsuccessful.

Having failed to dismantle the Bureau through lawful means, the Bureau's opponents now turn to unlawful ones. The Acting Director of the Bureau, Russell Vought, is a longstanding and vocal detractor of the CFPB, and he intends to stop the Bureau in its tracks by depriving it of any operational budget to carry out its statutory mandate or other work. Acting Director Vought recently announced that he will not draw new funds for the CFPB's continued operations, relying instead on the agency's accumulated operating reserve. Having starved the CFPB of incoming

funds, Defendants now seek to transfer away the agency's vital operating reserves, leaving it unable to carry out its congressionally mandated mission and statutorily required duties.

That scheme to unilaterally defund the CFPB is directly contrary to Congress' clear instructions in the Consumer Financial Protection Act of 2010 as well as the Administrative Procedure Act. It is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, as well as short of statutory right, and thus unlawful under the APA. It will irreparably harm Plaintiffs here—the City of Baltimore and Economic Action Maryland Fund—the people they serve, and countless others across the country by immediately depriving them of important services the CFPB provides (and is required by statute to provide).

Plaintiffs seek a temporary restraining order to stop the illegal defunding of the CFPB. The Court should issue an injunction to prevent Defendants from transferring the Bureau's reserve funds—a critical lifeline given Acting Director Vought's decision to forgo any incoming funds in the third quarter of this fiscal year—until this court has an opportunity to more carefully assess the facts and consider Plaintiffs' claims.

## LEGAL BACKGROUND

In the wake of the 2008 financial crisis, Congress established the Consumer Financial Protection Bureau by passage of the Consumer Financial Protection Act of 2010 ("CFPA"). Congress consolidated powers from several agencies and assigned them to the Bureau, along with broad responsibilities over the market for consumer financial products and services.

The CFPA instructs the Bureau to "seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). In furtherance of that mission, the CFPA *requires* the Director of the Bureau to: create and oversee a

number of specific components within the Bureau, make periodic reports to Congress, coordinate with state and federal agencies, and deliver certain services directly to members of the American public.

The CFPA also requires the CFPB to perform numerous other specified actions and provide other specific services. The agency, for example, must "establish[] a single, toll-free telephone number, a website, and a database or utiliz[e] an existing database to facilitate the centralized collection of, monitoring of, and response to consumer complaints" and route such complaints to other federal agencies. 12 U.S.C. § 5493(b)(3)(A). Its student loan ombudsman "shall": "receive, review, and attempt to resolve informally complaints from borrowers" of student loans; analyze data on those complaints; and make recommendations to Congress and executive branch officials. 12 U.S.C. § 5535(c)(1). The CFPA also requires that the agency "shall monitor for risks to consumers in the offering or provision of consumer financial products or services," 12 U.S.C. § 5512(c)(1), and "shall publish not fewer than 1 report of significant findings of its monitoring required by this subsection in each calendar year," 12 U.S.C. § 5512(c)(3)( A).

Likewise, the broader set of consumer laws and regulations that the CFPB administers requires other specific actions by the agency. Under the Electronic Fund Transfer Act, the CFPB must make reports to Congress, 15 U.S.C. § 1693p, and resolve requests to determine whether the Act preempts state laws in particular applications, *id.* § 1693q. The Home Mortgage Disclosure Act directs that the Bureau "shall provide staff and data processing resources" to an interagency body known as the Federal Financial Institutions Examination Council to facilitate the compilation, analysis, and publication of mortgage data collected under the Act. 12 U.S.C.

§ 2809(b). The CFPB must also calculate annually dollar amounts for several provisions in Regulation Z, the rule that implements the Truth in Lending Act.[1]

The CFPB is not funded through annual appropriations bills but through a provision in its enabling statute. 12 U.S.C. § 5497. Under that provision, the Bureau draws funds from the combined earnings of the Federal Reserve System. The Board of Governors of the Federal Reserve System transfers to the CFPB, either annually or quarterly, the amounts requested by the Director, up to a fixed cap that is set by statute and adjusted annually only for inflation. *Id.* § 5497(a)(2). The CFPA requires the Director to determine and request from the Board of Governors an amount "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)." *Id.* § 5497(a)(1). The Supreme Court upheld the constitutionality of this funding mechanism just last term in *CFPB v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024).

As a matter of responsible fiscal management, the CFPB maintains an operating reserve in order to meet unexpected shortfalls and ensure continuity in case of any gaps between incoming and outgoing funds. The CFPB reports that in fiscal year 2024, it had a fund balance with the Treasury of $249,866,492. CFPB, *Financial Report of the Consumer Financial Protection Bureau – Fiscal Year 2024*, 84 (Nov. 14, 2024), https://files.consumerfinance.gov/f/documents/cfpb_financial-report-fy-2024.pdf. For the CFPB's last quarterly draw of funds, for the second quarter of fiscal year 2024, then-Director Rohit Chopra requested and the Federal Reserve Board transferred $245,100,000. *See* CFPB,

---

[1] *See generally* Truth in Lending (Regulation Z) Annual Threshold Adjustments, CFPB https://www.consumerfinance.gov/rules-policy/final-rules/truth-lending-regulation-z-annual-threshold-adjustments-card-act-hoepa/ (acknowledging this as a requirement on the agency).

4

*Funds Transfer Request, FY 2025 Quarter 2* (Dec. 19, 2024),

https://files.consumerfinance.gov/f/documents/cfpb-12-19-letter-from-cfpb-to-frb_2025-01.pdf.

## FACTUAL BACKGROUND

Last month, President Trump named Office of Management and Budget Director Russell Vought as the Acting Director of the CFPB. Prior to serving in the Trump-Vance administration, Vought was an architect of the Heritage Foundation's Mandate for Leadership, Project 2025, which calls for abolishing the CFPB, asserting that the agency is "highly politicized, damaging, and utterly unaccountable."

Vought moved quickly to hamstring the Bureau and its operations after being named Acting Director. On February 8, the day after he became Acting Director, Vought instructed CFPB employees via an all-hands email to "[s]tand down from performing any work task."[2] That same day, Vought notified the Board of Governors that, as Acting Director, he was requesting $0 for the third quarter of fiscal year 2025.[3] Vought's letter stated that "no additional funds are necessary to carry out the authorities of the Bureau for Fiscal Year 2025." It suggested that the Bureau would be able to rely on a purported reserve balance of $711,586,678 to continue carrying out its authorities during the third quarter of fiscal year 2025. The letter also indicated that the Bureau's reserve fund was neither required by statute nor necessary to fulfill the Bureau's mandate. Vought closed the letter by, among other things, committing to "cut this

---

[2] Hugh Son, *Consumer Financial Protection Bureau Staff Told to 'Stand Down' From All Work*, CNBC.com (Feb. 9, 2025), https://www.cnbc.com/2025/02/09/consumer-financial-protection-bureau-staff-to-work-remotely-hq-shuttered.html.

[3] Vought's letter soon appeared on social media. *See* Philip Wegmann (@philipwegmann), X.com (Feb. 8, 2025), https://x.com/PhilipWegmann/status/1888418397311959198

excessive [reserve] fund." Later on X, Vought noted with regard to the reserve fund that, "This spigot, long contributing to CFPB's unaccountability, is now being turned off."[4]

The next day, Sunday, February 9, the Bureau's Chief Operating Office emailed all CFPB employees informing them that the Bureau's D.C. headquarters would be closed from February 10 through February 14.[5] This week, President Trump confirmed that he plans to close down the Bureau, which he stated "was set up to destroy some very good people."[6] During a White House press conference, Trump said the CFPB was "very important to get rid of."[7]

On February 10, after Vought announced that the CFPB would not be drawing funds for the third quarter in light of its supposed reserves of $711 million, Elon Musk posted on social media, "CFPB has $711M? That money should be returned to taxpayers."[8] Days earlier, on February 7, 2025, Mr. Musk had posted "CFPB RIP" to social media and commented in a reply to the post that CFPB "need[s] to go."[9] Plaintiffs allege that Defendant Vought is seeking to transfer the Bureau's reserve fund back to the Federal Reserve. Compl. ¶ 40.

By requesting $0 from the Federal Reserve for the upcoming quarter of the Fiscal Year and attempting to transfer the Bureau's reserve fund to the Federal Reserve, Defendant Vought intends to deprive the Bureau of operating funds. Without any operating funds, the Bureau will

---

[4] *See* Russ Vought (@russvought), X.com (Feb. 8, 2025), https://x.com/russvought/status/1888423503537360986.
[5] Lauren Kaori Gurley and Ian Duncan, *Consumer Financial Protection Bureau to shutter for a week*, Wash. Post (Feb. 9, 2025) https://www.washingtonpost.com/business/2025/02/09/cfpb-closure-doge/.
[6] Allison Pecorin and Elizabeth Schulze, *Democrats vow to fight shutdown of consumer watchdog agency*, ABC News (Feb. 12, 2025), https://abcnews.go.com/Politics/democrats-vow-fight-shutdown-consumer-financial-protection-bureau/story?id=118716115.
[7] *Id.*
[8] Elon Musk, (@elonmusk), X.com (Feb. 10, 2025) https://x.com/elonmusk/status/1889005419273638392.
[9] Elon Musk, (@elonmusk), X.com (Feb. 10, 2025) https://x.com/elonmusk/status/1887986703614243199.

be unable to perform its statutorily mandated functions or continue its other work. Those functions were transferred to the CFPB from numerous other agencies, at least one of which (the Office of Thrift Supervision) no longer exists. Indeed, just yesterday, Defendants canceled more than $100 million in vendor contracts for necessary services to support the CFPB's operations[10]; as of the date of this filing, it appears that the statutorily required phone line for submitting consumers complaints is no longer accessible, *see* Moore Decl. ¶¶ 5-6, *see also* 12 U.S.C. § 5493(b)(3)(A).

## STANDARD OF REVIEW

The same standard applies to a motion for a temporary restraining order as applies to a request for a preliminary injunction. *Maages Auditorium v. Prince George's Cnty., Md.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014), *aff'd*, 681 Fed. App'x 256 (4th Cir. 2017). In either case, the plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)) (cleaned up). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

I.     **Plaintiffs are likely to succeed on the merits.**

The Administrative Procedure Act authorizes courts to review "final agency action." 5 U.S.C. § 704. The APA requires courts to hold unlawful final agency actions that are "arbitrary,

---

[10] *See* Evan Weinberger, *CFPB Cuts Over $100 Million in Contracts Amid DOGE Probe*, Bloomberg Law (Feb. 11, 2025), https://news.bloomberglaw.com/us-law-week/cfpb-cancels-more-than-100-million-in-contracts-amid-doge-probe.

7

capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(A), (C).

Defendants' decision to defund the CFPB is final agency action subject to this Court's review. For agency action to be "final" it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted). Defendants' scheme to transfer the CFPB's operating reserve after drawing $0 in funding for the next quarter marks the consummation of the agency's decisionmaking process with respect to the CFPB's immediate funding needs. It is also an action "by which rights or obligations have been determined, or from which legal consequences will flow," *see id.*, because it determines the amount the Bureau will draw in the third quarter of fiscal year 2025 and the disposition of the Bureau's existing operating reserves, and therefore the Bureau's ability to carry out its mission and specific duties required of it by law.

That action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in several respects. 5 U.S.C. § 706(2)(A). First, Defendants' choice to defund the Bureau is arbitrary and capricious because it takes no account of the clear and obvious harms that will be caused by shutting down the country's primary regulator of the market for consumer financial products and services, including mortgages, credit cards, debt collection, payday loans, and credit reporting. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action is arbitrary and capricious where it "entirely fail[s] to consider an important aspect of the problem").

The CFPB has won "over $21 billion in relief for over 200 million people harmed by credit bureaus, big banks, debt collectors and predatory lenders."[11] Defendants' action provides no reasoned explanation for why precipitously cutting off these benefits to everyday American consumers is a rational choice, particularly when compared to CFPB's relatively small budget, *see infra* at 14. And Defendants likewise utterly failed to consider the interests of the millions of Americans who rely on CFPB—including, for example, Plaintiffs. *See* Leach Decl. ¶¶ 15-17; White Decl. ¶¶ 8, 13-15; *see also Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) ("When an agency changes course, as [CFPB] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (internal quotation marks and citations omitted)).

Second, that action is an abuse of discretion and not in accordance with law because it would leave the Bureau unable to carry out both its general mission and specific actions and functions required by statute. *See, e.g.*, 12 U.S.C. § 5493 (listing numerous functions the Bureau and its components are required to carry out, e.g., "the Bureau *shall* share consumer complaint information with prudential regulators, the Federal Trade Commission, other Federal agencies, and State agencies" and "functions *shall* include establishing a single, toll-free telephone number, a website, and a database or utilizing an existing database to facilitate the centralized collection of, monitoring of, and response to consumer complaints") (emphases added); *see also supra* at 2-4. These requirements—unmistakably framed as mandatory—permit no discretion to do otherwise. And a decision that will necessarily cause CFPB to violate the law, including its own authorizing statute, per se abuses any discretion Defendants may have.

---

[11] Nat'l Consumer Law Center, *Unlawful Shut Down of Consumer Agency Endangers Working Families, Honest Businesses, the Economy* (Feb. 10, 2025), https://www.nclc.org/unlawful-shut-down-of-consumer-agency-endangers-working-families-honest-businesses-the-economy/.

Third, Defendants' gambit of drawing $0 in funding while at the same time eliminating the agency's existing reserves is not in accordance with law because the CFPB Director is statutorily required to request an amount that is "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law." 12 U.S.C. § 5497(a)(1). While a Bureau Director or Acting Director must make some determination about what is reasonably necessary for the CFPB to carry out its authorities and how much it will cost to do so, a determination that *no* money is necessary is tantamount to a decision that the Bureau does not need to do *anything* to carry out its authorities. But the CFPA makes clear that that cannot be so: Even if the Bureau were to abandon all work except that expressly required by Congress in the CFPA, it would still be statutorily required to perform numerous functions, *see, e.g.*, Compl. ¶¶ 10-18 (listing some mandatory functions of the Bureau). These functions necessarily cost money, and Defendants' defunding of the agency makes carrying out those mandatory functions impossible.

For largely the same reasons, Defendants' action is also invalid as "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Defendants are required to draw an amount "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law," 12 U.S.C. § 5497(a)(1), and lack statutory authority to take action intended to leave the Bureau without necessary funds to carry out those authorities and responsibilities.[12]

---

[12] In the alternative, in light of the $0 quarterly funding request, Defendants' decision to transfer the Bureau's reserve fund back to the Federal Reserve—standing alone—runs afoul of the APA for all of the same reasons that the final agency action of requesting $0 and transferring the existing reserve (in conjunction) does, as described above.

10

## II. Plaintiffs will suffer irreparable harm without immediate relief.

"To establish irreparable harm, the movant must make a clear showing that it will suffer harm that is "neither remote nor speculative, but actual and imminent." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quotation marks omitted). "[T]he harm must be irreparable, meaning that it cannot be fully rectified by the final judgment after trial." *Id.* (quotation marks omitted).

"[O]bstacles" that "make it more difficult for [Plaintiffs] to accomplish their primary mission" suffice to show irreparable injury. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *accord Action NC v. Strach*, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016) (explaining that plaintiffs may suffer irreparable injury from actions that "perceptibly impair" their ability to carry out their core missions). Relatedly, actions that require the "diversion of resources away from [organizations'] core missions" constitute irreparable harm sufficient to grant preliminary relief. *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021); *cf. Republican Nat'l Comm. v. N. Carolina State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024) (finding injury-in-fact for standing purposes where "Defendants' actions and inaction directly impact Plaintiffs' core organizational mission").

Plaintiffs here stand to suffer precisely such irreparable harms from Defendants' defunding of the CFPB. If the CFPB were stood down in violation of its statute and the APA, it would directly impact and interfere with both Plaintiffs' ability to carry out key parts of their basic missions.

Economic Action is a nonprofit devoted to economic inclusion and financial justice through research, advocacy, consumer education, and direct services. White Decl. ¶¶ 2-3. Its direct services include providing counseling assistance and financial education to help Maryland

11

consumers find solutions to problems they encounter with common scams, financial exploitation, medical debt, and other financial issues. *Id.* ¶¶ 4-7.

Should CFPB be defunded and cease to perform its important statutory functions, Economic Action's ability to carry out its core direct-services work for individuals who are the subject of scams or abusive financial practices would be significantly impeded, and Economic Action would be forced to shift resources from its other work to try to make up the difference. *Id.* ¶¶ 8, 13-14; Compl. ¶ 52. For example, Economic Action relies on the CFPB complaint database both to serve more consumers and to achieve better results than they could on their own. White Decl. ¶¶ 8, 14. The CFPB complaint system allows consumers to bring their issues directly to the agency, which then routes them to the appropriate company for a response. Filing a complaint with the CFPB is free and—especially in comparison to other options—easy, and it can deliver real results for consumers. *Id.* ¶¶ 7-8. The CFPB also makes available some complaints in a redacted and searchable format. Economic Action uses this information, which allows users to search for particular companies, issues, and consumers in specific areas, to identify problems and understand the challenges facing consumers in Maryland. *Id.* ¶ 9.

Without the complaint resource, Economic Action would be forced to divert more resources to that project, either cutting back on existing work providing direct services to consumers, or diverting resources away from other core components of the organization's mission. *Id.* ¶ 13. And without the Home Mortgage Disclosure Act database—a CFPB product Economic Action deems irreplaceable, *Id.* ¶ 12—Economic Action will be without the tools it needs to provide certain critical direct services work for borrowers. "[E]ven if [Economic Action] were to reduce staff time elsewhere to try to fill this need, [its] efforts would be less effective." *Id.* ¶ 14. In short, the shuttering of the CFPB will create further "obstacles" that

frustrate Economic Action's ability to "accomplish [its] primary mission" of providing direct services to Maryland consumers in need. *See League of Women Voters of the U.S.*, 838 F.3d at 9; White Decl. ¶¶ 10-14; Compl. ¶¶ 55-56 These harms are irreparable, as an inability to provide direct services to the same volume of clients, at the same quality level, cannot be made up for by mere money later—and, even if money could redress those injuries, it cannot be recovered from Defendants later given their sovereign immunity. *See Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 500 (D. Md. 2020) (harm is irreparable because "the government is protected by sovereign immunity and no monetary damages are available").

      The same is at least as true for the City of Baltimore. With the loss of the range of consumer protection benefits that the CFPB provides, the City would need to divert resources from other essential city functions to its consumer protection operations in an effort to provide residents protection from scams and other unlawful financial practices. Leach Decl. ¶¶ 15-17; Compl. ¶ 47. Further, Baltimore relies on the complaints collected by the CFPB to understand the range of consumer protection issues facing Baltimoreans; this information and context allows Baltimore consumer protection officials to identify and prioritize affirmative consumer protection actions. Leach Decl. ¶¶ 14-15. Without the benefit of the complaint information collected, maintained, and provided by the CFPB, Baltimore City Law Department officials will be forced to conduct additional research to identify and prioritize affirmative work—necessarily diverting time from other important Law Department efforts. *Id.* ¶ 15, 17.

      Moreover, even if Baltimore scrambles its allocation of resources to fill these gaps, their efforts would still be "less likely to yield comprehensive results than the CFPB's," given, for example, "the CFPB complaint function's high visibility and the CFPB's central role in the enforcement space." *Id.* ¶ 15. "As a result, individual Baltimore enforcement actions will be

13

less effective and more resource-intensive," *id.*, directly harming the quality of services Baltimore is able to provide and frustrating a core mission of the City's government, *id*. ¶¶ 10, 12.

### III. The balance of equities and public interest strongly favor preliminary relief.

The final two factors to consider in weighing whether to order preliminary relief—the balance of equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken*, 556 U.S. at 435). These factors weigh heavily in favor of preliminary relief here.

The public has a strong interest in the required execution of the CFPA and other consumer laws enacted by Congress, and, specifically, in the Bureau's continued funding and operation. Congress has mandated that the Bureau carry out numerous functions to enforce consumer financial protections and to otherwise ensure the public has access to a market of fair and transparent consumer financial services. *See* 12 U.S.C. § 5493. The broad reach of the Bureau's work further demonstrates the public's interest in the Bureau's continued funding and operation. Since its inception, the Bureau has recovered more than $21 billion in consumer relief and received more than 10 million consumer complaints. Nat'l Consumer Law Center, *supra* n. 10; CFPB, *CFPB Hits 10 Million Complaints Milestone*, YouTube https://www.youtube.com/watch?v=ALcMFm7zaGg.

By contrast, Defendants have no legitimate interest in unlawfully defunding the Bureau to prevent it from carrying out its statutorily required duties, as preliminary relief that prohibits unlawful government conduct "will work no harm to the [government's] legitimate and lawful interests." *Doe v. Pittsylvania Cnty*., 842 F. Supp. 2d 927, 935 (W.D. Va. 2012); *see also*

*Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice").

And any interest Defendants may claim to possess in (purported) prudential fiscal management cannot justify a rapid and wholesale defunding of a Bureau whose budget typically amounts to a miniscule fraction of federal spending: In 2024, $763 million in Bureau funding was drawn from the Fed, while total federal expenditures were $6.75 trillion.[13] Immediately defunding the Bureau, within only days of Acting Director Vought assuming control, is the type of "drastic" government action with "far-reaching consequences" that courts have found counsels in favor of emergency relief, even when the government's countervailing interest is significantly more compelling than Defendants' interest here. *Ass'n of Cmty. Cancer Centers*, 509 F. Supp. 3d at (finding equities and public interest weighed in favor of enjoining drug price regulation issued during pandemic).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a Temporary Restraining Order enjoining Defendants from taking any steps to defund the Consumer Financial Protection Bureau, including by transferring the Bureau's reserve funds or otherwise using them for a purpose other than the operation of the Bureau.

---

[13] *See* Cong. Res. Serv., *Financial Services and General Government FY2025 Appropriations: CFPB's Funding and Structure Provisions* (Aug. 21, 2024), https://tinyurl.com/yc26yjcp; U.S. Dep't of the Treas., *How much has the U.S. government spent this year?*, https://fiscaldata.treasury.gov/americas-finance-guide/federal-spending/#federal-spending-overview.

15

Dated: February 12, 2025                              Respectfully submitted,

/s/ *Mark B. Samburg*

Mark B. Samburg
Kevin E. Friedl*
Daniel McGrath*
Jessica Anne Morton*
J. Sterling Moore*
Robin F. Thurston*
Skye L. Perryman*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
msamburg@democracyforward.org
kfriedl@democracyforward.org
dmcgrath@democracyforward.org
jmorton@democracyforward.org
smoore@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

**Pro hac vice* application pending*