**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,<br><br>Defendants. | Case No. 25-cv-458-MJM |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION**
**FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................2

I.      Statutory Background ................................................................................................2

II.     Factual Background ....................................................................................................2

III.    Procedural History......................................................................................................4

STANDARD OF REVIEW .....................................................................................................4

ARGUMENT ..........................................................................................................................5

I.      Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims ...............................5

        A.      Plaintiffs Are Not Seeking Judicial Review of a Nonabstract, Discrete
                Agency Action, Let Alone a Final Agency Action.................................................5

        B.      Plaintiffs' Claims Are Not Ripe........................................................................10

        C.      Agency Actions that Allocate Funding and Reflect Bureau Decisions
                About How Many Resources are Needed to Fulfill Statutory
                Responsibilities are Committed to Agency Discretion by Law..........................12

        D.      Plaintiffs Have No APA Cause of Action Against the CFPB Because of
                Adequate Alternative Remedies Against Financial Sector Entities.....................16

        E.      The CFPA Does Not Foreclose the Vought Letter ...............................................19

        F.      In Fashioning the Vought Letter, and as Part of Defendants' Ongoing
                Decision-Making, Defendants Have Made and Are Making Reasonable
                Judgments ......................................................................................................20

II.     Plaintiffs Do Not Face Irreparable Harm Justifying Extraordinary Remedies ................23

III.    The Equities and Public Interest Weigh Against a Preliminary Injunction ......................25

IV.     The Requested Injunction Fails the Specificity Requirements of Rule 65(d)(1) .............26

CONCLUSION......................................................................................................................26

## INTRODUCTION

Plaintiffs, Economic Action Maryland Fund and the Mayor and City Council of Baltimore, bring an attack against policy decision-making committed to the discretion of the Executive Branch. *See generally* ECF No. 1. They claim that Defendants, the Consumer Financial Protection Bureau ("CFPB" or the "Bureau") and its Acting Director, Russell Vought (together, the "Defendants"), are engaged in an effort "to effectively defund the CFPB" by virtue of their unremarkable decision not to "draw additional funds" from the Federal Reserve for the third quarter of the 2025 fiscal year—having reasonably determined "that the agency's existing operating reserves are sufficient" for this fiscal year—and allege that "Defendants are poised to transfer away those operating reserves, leaving the CFPB defunded." *Id*. at 1-2. Plaintiffs seek to prevent these alleged future transfers through an overbroad injunction that would essentially place CFPB in a receivership, with its day-to-day financial decisions superintended by the Court. *See, e.g., id*., Prayer for Relief; Proposed Order Granting Mot. for TRO, ECF No. 8-5 ("Proposed Order"), p. 1 (requesting that the Court enjoin Defendants "from taking any steps to defund [CFPB], including by transferring the Bureau's reserve funds or otherwise using them for a purpose other than the operation of the Bureau"). This is not the proper role of the judiciary and Plaintiffs have failed to demonstrate that they satisfy any of prerequisites for issuance of the extraordinary relief they seek.

In all events, Plaintiffs' motion fails to establish a likelihood of success on the merits of its claims. As an initial matter, Plaintiffs' claims face fundamental threshold flaws. Principally, because Plaintiffs' claims do not challenge any agency action, much less any final agency action, they cannot be brought under the Administrative Procedure Act ("APA"). Further, Plaintiffs' claims are unripe. And they are foreclosed because Plaintiffs have an adequate remedy in a court. Even if Plaintiffs' claims were properly before this Court, their claims are meritless on its own terms. Plaintiffs cannot demonstrate that Defendants have acted contrary to law, arbitrarily or capriciously, or exceeded their statutory authority. Defendants' exercise of appropriate discretion

1

over the finances of the CFPB is committed to agency discretion and not properly subject to judicial review or violative of the APA.

Finally, any finding of irreparable harm justifying an injunction would be misplaced. Although Plaintiffs argue that they will suffer irreparable harm if Defendants take steps to reduce the size of the reserve fund, these fears are belied by the record. And because the public has an interest in ensuring that federal funding is spent judiciously and efficiently, in line with the policy priorities of the democratically elected administration, the public interest and balance of the equities tip in Defendants' favor. As such, Plaintiffs have not established the criteria necessary for this Court to enter the extraordinary remedy of a preliminary injunction.

## BACKGROUND

### I.    Statutory Background

The Bureau was established as part of the Federal Reserve System by the Consumer Financial Protection Act of 2010 ("CFPA"), Pub. L. No. 111-203, Tit. X, 124 Stat. 1955. The Bureau is charged with implementing the federal consumer financial laws, principally for purposes of ensuring "consumers are protected from unfair, deceptive, or abusive acts and practices." 12 U.S.C. § 5511.

The CFPA provides that the Bureau receives up to a capped amount of funds each year from the combined earnings of the Federal Reserve System. 12 U.S.C. § 5497(a). Since 2013, that cap has been set at 12 percent of the Federal Reserve System's 2009 operating expenses, adjusted annually for inflation. *Id.* § 5497(a)(2)(A)(iii), (B). The Bureau may draw an amount, up to but not exceeding this cap, as "determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)." *Id.* § 5497(a)(1).

### II.   Factual Background

The Bureau maintains two types of funds: (1) the Bureau of Consumer Financial Protection Fund ("Bureau Fund") and (2) the Civil Penalty Fund. Exhibit ("Ex.") 1, Declaration of Ngagne

2

Jafnar Gueye ("Gueye Decl.") ¶ 3.  The Federal Reserve funds the Bureau Fund through transfers administered by the Board of Governors of the Federal Reserve System, and this money is used for the Bureau's operations and expenses.  *Id*.  Entirely separate from the Bureau Fund, the Civil Penalty Fund is funded by civil penalties imposed and collected by the Bureau—not the Federal Reserve.  *Id*.  The Civil Penalty Fund is used to redress harmed consumers.  *Id*.  As of January 2025, the collective balance of these funds was over $1.175 billion.  *Id*. ¶¶ 4-5.

On February 7, 2025, President Trump appointed Russell Vought to act as the Acting Director of CFPB.  Gueye Decl., ¶ 7.  Consistent with the Trump Administration's goals of reducing wasteful spending and streaming efficiencies in the federal government, Acting Director Vought reviewed the sums available to the Bureau and sent a letter to the Federal Reserve on February 8, 2025, stating that CFPB would be requesting $0 for the Third Quarter of Fiscal Year 2025, having determined that the hundreds of millions of dollars in existing funds are sufficient to support the agency's operations and indeed that the current balance of funds are "more than sufficient—and are, in fact, excessive—to carry out" CFPB's duties.  Ex B to Gueye Decl. ("Vought Letter").  Gueye Decl. ¶¶ 6-11

> In the final paragraph of the Letter, Acting Director Vought stated that:
>
> In the past, the Bureau has at times opted to maintain a "reserve fund" for financial contingencies.  But no such fund is required by statute or necessary to fulfill the Bureau's mandate.  The Bureau's new leadership will run a substantially more streamlined and efficient bureau, cut this excessive fund, and do its part to reduce the federal deficit.

Vought Letter.  The "reserve fund" that Acting Director Vought references in this paragraph is neither the Civil Penalty Fund, nor the entirety of the Bureau Fund, nor the entirety of the unobligated portion of the Bureau Fund.  Rather, the "reserve fund" refers only to a component of the Bureau Fund totaling approximately $220 million.  Ex. 1, Gueye Decl. ¶ 13.  And reducing the excess in this reserve fund would make that money immediately available to the Bureau for its operations; it would not result in a transfer of money to another agency or entity.  *Id*. ¶ 15.  The Bureau is engaged in an ongoing evaluation and assessment to determine the proper amount to

reduce the reserve fund, freeing up those sums for operations.  *Id.* ¶ 14.  The Bureau has made no attempts to transfer any of its funds back to the Federal Reserve.  *Id.* ¶ 16.

## III.  Procedural History

Plaintiffs filed their Complaint on February 12, 2025, alleging that Defendants would violate the APA were they to transfer all of the CFPB's financial assets back to the Federal Reserve, in light of their decision to request no additional funding from the Federal Reserve for the third quarter of this fiscal year.  *See* ECF No. 1 ¶¶ 58-66.  That night, Plaintiffs filed a motion for a temporary restraining order and asked the Court to enjoin Defendants from "taking any steps to defund the Consumer Financial Protection Bureau, including by transferring the Bureau's reserve funds or otherwise using them for a purpose other than the operation of the Bureau." Proposed Order at 1; *see also* Pls.' Mem. of P. & A. in Supp. of Mot. for a TRO, ECF No. 8-1 ("Pls.' Mot.").

Upon agreement of the parties and following a telephone conference, the parties filed a Joint Motion for Briefing Schedule, converting Plaintiffs' motion for a temporary restraining order into a motion for preliminary injunction, and memorializing Defendants' agreement not to transfer CFPB's reserve funds prior to 9:00 a.m. Eastern on February 28, 2025.  *See* ECF No. 17.  A preliminary injunction hearing is set for February 26, 2025.  ECF No. 25 (Paperless Order).

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Preliminary injunctions "involv[e] the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). Plaintiffs must "by a clear showing" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted).  The third and fourth factors of the analysis "merge when the Government is the opposing party." *Nken v. Holder,* 556 U.S. 418, 435 (2009).  Plaintiffs must

establish each of the four factors in order to qualify for injunctive relief. *See Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (acknowledging that the Fourth Circuit recalibrated its preliminary injunction balancing test in light of the Supreme Court's decision in *Winter*).

## ARGUMENT

Plaintiffs have failed to meet their burden to demonstrate any of the requirements to obtain preliminary relief.  For starters, Plaintiffs' claims fail out the outset because Plaintiffs are not seeking judicial review of a discrete, nonabstract, agency action, much less a final agency action; because those claims are not ripe; because the funding choices CFPB has made are committed to agency discretion by law; and because adequate alternative remedies exist; thus precluding APA review.  Plaintiffs therefore cannot succeed on the merits because this Court cannot even reach the merits.  But even if it could, Plaintiffs' claims still fail because CFPB's actions were statutorily permissible and were neither arbitrary nor capricious.  As for the other preliminary injunction factors, Plaintiffs have not demonstrated imminent irreparable harm sufficient to justify extraordinary relief, and the balance of equities and public interest tip in favor of Defendants because the public has an interest in ensuring that federal funding is spent judiciously and efficiently, in line with the policy priorities of the newly elected presidential administration.  For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

## I.  Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

Plaintiffs cannot show they are likely to succeed on the merits of any of their claims, which are jurisdictionally flawed and substantively fail in any event.

### A. Plaintiffs Are Not Seeking Judicial Review of a Nonabstract, Discrete Agency Action, Let Alone a Final Agency Action.

Plaintiffs fail to state a claim under the APA because they are not petitioning for judicial review of a circumscribed and discrete agency action.  "Under the terms of the APA, [Plaintiffs] must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). *See* 5 U.S.C. § 551(13) (defining "agency action").  "The term 'action' as used in the APA is a term of art that does not include all conduct

such as, for example, . . . operating a program[.]" *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013). "The term is similar in concept to the meaning of 'final decision' as used in describing the appealability of court orders." *Id*. "The Supreme Court has recognized that this provision refers only to conduct that is 'circumscribed' and 'discrete.'" *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004)). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [the Court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted).

Plaintiffs' motion is exactly the type of "generalized complaint[]" regarding the "operat[ion of] a program" that the APA forbids. To be sure, the Vought Letter requested that the Board of Governors of the Federal Reserve System transfer zero dollars for the Third Quarter of Fiscal Year 2025. ECF No. 1, ¶¶ 32-34. But Plaintiffs do not challenge that discrete document, which is not reviewable "final agency action" under the APA in any event, *see infra* pp. 8-10. Instead, Plaintiffs seek judicial review of ongoing management decision-making governing the overall operation of the Bureau, framing the agency's supposed plans for how to operationalize the reserve fund—even while it is already sitting on hundreds of millions of dollars in other funds—as a purported "scheme to unilaterally defund the CFPB." Pls.' Mot., p 2. To be clear, The Bureau has made no attempts to transfer any of its funds back to the Federal Reserve and the agency's Chief Financial Officer ("CFO") is unaware of any mechanism for doing so. Ex. 1, Gueye Decl. ¶ 16. But for purposes of APA review, neither a purported "scheme" nor a purported "gambit," *see* Pls.' Mot., pp. 8, 10, can be a circumscribed and discrete agency action subject to judicial review. See *Vill. of Bald Head Island*, 714 F.3d at 194.

Plaintiffs fare no better merely by characterizing their challenge as one to a purported "decision" to leave the CFPB without access to any operating funds. *See* ECF No. 1, ¶¶ 61-62, 66. The APA does not permit review of an "abstract decision" even if it is circumscribed and discrete. *See Biden v. Texas*, 597 U.S. 785, 809 (2022). Rather, only "specific agency action, as

defined in the APA" is subject to review. *Id.* The APA makes this Court one of review, not first view. *See* 5 U.S.C § 706 (referring to the "reviewing court"); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 795 (D. Md. 2020) ("the district judge sits as an appellate tribunal" (citation omitted)). And Plaintiffs' Complaint does not petition for judicial review of a nonabstract "agency statement . . . designed to implement, interpret, or prescribe law or policy," *see Biden*, 597 U.S. at 809 (quoting 5 U.S.C. § 551(4)), or other "final disposition," 5 U.S.C. § 551(6), "determin[ing] that no money is necessary" to operate the agency, *see* Pls.' Mot., p. 10. Because no nonabstract "agency action" eliminating the agency's existing funds existed when the Complaint petitioning for judicial review was filed, it cannot be subject to judicial review in this case. *EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel."); *see also Lujan*, 497 U.S. at 893 ("actions yet to be taken . . . cannot be laid before the courts . . . under the APA").[1] Moreover, one agency action "combined with" another, as challenged in the Complaint, ECF No. 1, ¶ 60, is not "agency action that is circumscribed and discrete." *Vill. of Bald Head Island*, 714 F.3d at 194.

Although the final sentence of the Vought Letter states that Acting Director Vought intends to run a "substantially more streamlined and efficient bureau" and to "cut" the reserve fund if possible, Vought Letter, that statement does not reflect a determination that "no money is necessary" to operate the CFPB, *see* Pls.' Mot., p. 10, given that the reserve fund is merely one component of the agency's several funds and that reducing the reserve fund means making more funding available for the agency to use now, Ex. 1, Gueye Decl. ¶¶ 3-16. And the Bureau is engaged in an ongoing evaluation and assessment to determine the proper amount by which to reduce the Reserve Fund, freeing those sums up for immediate use. Ex. 1, Gueye Decl. ¶ 14. Moreover, the predicate to running a "more streamlined and efficient bureau" is that there will

---

[1] Although this rule stems from the plain language of the APA, it is also consistent with the law of this Circuit, which identifies the "final agency action" requirement as jurisdictional. *See Nat'l Veterans Legal Servs. Program*, 990 F.3d at 839. And "[j]urisdiction is to be assessed under the facts existing *when the complaint is filed*." *Penegar v. Liberty Mut. Ins. Co.*, 115 F.4th 294, 303 (4th Cir. 2024) (citation omitted).

continue to be CFPB operations that will require the expenditure of funds.  Vought Letter.  The Vought Letter says as much, acknowledging that Bureau financing requires an analysis of the funds needed to "carry out [CFPB's] authorities in a manner that is consistent with the public interest." *Id*.

Even setting aside the abstract—and unsupported—nature of Plaintiffs' challenge, the letter reflecting the decision to not seek third quarter funding from the Federal Reserve does not constitute "final agency action" under the APA.  5 U.S.C. § 704.  There are two requirements for finality.  First, the action must "mark the 'consummation' of the agency's decisionmaking process[.]"  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted).  It may not be a "preliminary, procedural, or intermediate agency action[.]"  5 U.S.C. § 704.  Second, the action must "be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett*, 520 U.S. at 178 (citation omitted).  Again, Defendants have made no decision to eliminate the agency's existing reserves and the agency's CFO is not aware of any mechanism to transfer any of the agency's funds back to the Federal Reserve.  Ex. 1, Gueye Decl. ¶¶ 14, 16.  Thus, neither prong can be satisfied with respect to that issue.  *See Appalachian Energy Grp. v. EPA*, 33 F.3d 319, 322 (4th Cir. 1994) (no final agency action where agency "has not taken any action at this point triggering [the court's] power to review its position"); ECF No. 1, ¶¶ 60, 65-66.

Even if Plaintiffs were seeking judicial review of the Vought Letter itself, *see* ECF No. 1, ¶ 32 (referring to Vought Letter in factual allegations of Complaint), *but see id*. ¶¶ 60-63, 66 (challenging abstract decisions or not discrete decisions other than the Vought Letter itself in the APA counts), it includes at least two "part[s.]"  5 U.S.C. § 551(13) ("'agency action' includes the whole *or part* of" several categories of decisions (emphasis added)).  Neither is a final agency action.  The first part—the first three paragraphs of the Vought Letter—is not a final agency action because it does not satisfy *Bennett* prong two.  The second part—the final paragraph of the Vought Letter—is not a final agency action because it does not satisfy either *Bennett* prong.

Start with the final paragraph, which states that CBPB's new leadership will reduce the

Bureau's "reserve fund."  That statement in no way marks the consummation of the agency's decision-making process addressing the reserve fund.  The Bureau is engaged in an ongoing evaluation and assessment to determine the proper amount by which reduce the Reserve Fund.  Ex. 1, Gueye Decl. ¶ 14.  Acting Director Vought's statement is thus "preliminary" in nature and "not directly reviewable."  *See* 5 U.S.C. § 704.  "It may be a step, which if erroneous will mature into a prejudicial result[.]" Chi. *& S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948). But that does not make the Vought Letter itself the "consummation of the administrative process" dealing with how to address the CFPB's reserves.  *Id*. at 113.

No part of the Vought Letter satisfies the second *Bennett* prong.  Prong two's language includes terms of art reflecting "a 'pragmatic' inquiry that requires courts to examine the 'concrete consequences' of an agency action."  *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (citation omitted).  The court must consider the "concrete impact the [agency action] had on [the Plaintiffs]."  *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004); *see also Fed. Trade Comm'n v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (considering whether agency action had a "'direct and immediate . . . effect on the day-to-day business' of the complaining parties" (citation omitted)); *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("This limitation ensures that judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties").  And Plaintiffs here do not allege any injury due to the Vought Letter alone.  Plaintiffs have not shown that the Bureau's existing funds are insufficient for the agency to carry out the activities that interest them.  But the standard is greater than that.  *City of New York*, 913 F.3d at 431.  For example, courts look to whether a plaintiff faces any "risk of significant criminal and civil penalties" for failing to comply with a challenged agency action. *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 637 (D.C. Cir. 2019).  And the Vought Letter results in nothing like that type of consequence for Plaintiffs.

Moreover, in making prong two determinations, courts consider pragmatic issues that would arise from considering the agency action to be reviewable.  *Standard Oil*, 449 U.S. at 242-

43 (considering that reviewing particular agency action would "interfere[] with the proper functioning of the agency" and turn "prosecutor into defendant before adjudication concludes"); *City of New York*, 913 F.3d at 432 (considering "incursion into internal agency management"). And that pragmatic inquiry is made in the context of "the specific statutes and regulations that govern" the agency action at issue. *Cal. Cmtys.*, 934 F.3d at 637. Here, the statute governing Acting Director Vought's letter contemplates routine determinations of the amounts deemed reasonably necessary to carry out the authorities of the Bureau—each year or each quarter of each year. 12 U.S.C. § 5497(a)(1). As a matter of practice, the agency makes determinations on a quarterly basis.[2] Subjecting each one of those determinations to judicial review by complainants who think the agency is seeking either too much or too little funding risks paralyzing the agency every quarter, which is incompatible with the statutory design. *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 63 (2020) (2020) (Alito, J., concurring in part and dissenting in part) (considering that APA review sometimes precludes an agency action from taking effect "during an entire Presidential term"); *see also City of New York*, 913 F.3d at 434-35 (rejecting the notion that the APA permits a plaintiff to sue an agency "for violations of financial management laws, arguing that with more money in its coffers more grants could be issued" because the "possibilities for litigation would be endless"); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006) ("Judicial review of such budget initiatives would wreak havoc with the normal operations of agencies and the executive branch").

   **B. Plaintiffs' Claims Are Not Ripe.**

Plaintiffs are unlikely to succeed on the merits because their claims are not ripe. In assessing ripeness, courts "consider[] the fitness of the issues before the court, as well as the hardship that the parties will experience if the court withholds consideration of the dispute." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013). "In the administrative context," the requirement of ripeness "protect[s] . . . agencies from judicial

---

[2] CFPB, *Funds transfer requests*, https://www.consumerfinance.gov/about-us/budget-strategy/funds-transfer-requests/ (last visited Feb. 19, 2025).

interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Standage v. Braithwaite*, 526 F. Supp. 3d 56, 92 (D. Md. 2021) (quoting *Ohio Forestry Ass'n  v. Sierra Club*, 523 U.S. 726, 732–33 (1998)); *see also Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 295 (4th Cir. 2022) (noting the same).

Plaintiffs' claims are not fit for review. Plaintiffs' claims are premised on the notion that that CFPB intends to "determin[e] that no money is necessary" to operate the CFPB. Pls.' Mot., p. 10. But the agency has done no such thing. Ex. 1, Gueye Decl. ¶¶ 3-18. To be sure, new agency leadership intends to focus CFPB's operations so they more closely align with its statutory mandate, which is consistent with the policy priorities of the new administration. But "[a]ny prediction how the [agency] might eventually implement" the new administration's policy goals, other than Acting Director Vought's determination that no additional funding is needed to carry out the authorities of the CFPB for Fiscal Year 2025, "is 'no more than conjecture' at this time." *See Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted).

Nor have Plaintiffs demonstrated hardship from withholding review while the agency completes its decision-making process. The Court must consider whether withholding review would "create 'adverse effects of a strictly legal kind'" to the party seeking review. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 809 (2003) (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733). *See also Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967) (considering harm to the party seeking judicial review). A plaintiff faces no hardship when, in the meantime, it is not required "to do anything or to refrain from doing anything." *Trump*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733).

Plaintiffs face no such hardship. The CFPB's resources, such as its consumer complaint database, remain available to them. Ex. 1, Gueye Decl. ¶¶ 18-20. But even if those resources were unavailable, Plaintiffs' interests in maintaining the "benefit[s]" they obtain "from the regulatory protection [of the CFPB], which they hope [this Court's] judicial review will insure," is "not a 'hardship' contemplated by the prudential ripeness rubric." *Wyoming v. Zinke*, 871 F.3d 1133, 1143 (10th Cir. 2017); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 58 (1993) (agency

11

actions do not impose hardship when they "impose no penalties for violating any newly imposed restriction, but [rather] limit access to a benefit created by [statute] but not automatically bestowed on" beneficiaries).

### C. Agency Actions that Allocate Funding and Reflect Bureau Decisions About How Many Resources are Needed to Fulfill Statutory Responsibilities are Committed to Agency Discretion by Law.

At bottom, the funding choices Plaintiffs challenge here—including the decision of how much funding to request from the Federal Reserve for the upcoming quarter and the decision of whether and how large a reserve fund the CFPB should maintain—reflect financial management decisions that are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). These resource allocation decisions involve implementation of 12 U.S.C. § 5497(a)(1), which expressly authorizes the Director of the CFPB to "determine[]" how much funding is "reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)." Insofar as Plaintiffs' claims challenge these funding decisions, they fall squarely under § 701(a)(2).

"[U]nder § 701(a)(2), even when Congress has not affirmatively precluded judicial oversight, 'review is not to be had if the [relevant] statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Webster v. Doe*, 486 U.S. 592, 599-600 (1988) (citation omitted). "In such a case, the statute (law) can be taken to have committed the decisionmaking to the agency's judgment absolutely." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citation omitted). In these matters, "the inappropriateness or even mischief involved in appraising a claim of error or of abuse of discretion, . . . leads to the conclusion that there has been withdrawn from the judicial ambit any consideration of whether the official action is 'arbitrary' or constitutes an abuse of discretion." *Curran v. Laird*, 420 F.2d 122, 131 (D.C. Cir. 1969). Courts "consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002). Here, each factor shows that Defendants' financial management decisions under 12 U.S.C. § 5497(a)(1) are committed to agency discretion.

First, the resource allocation decisions at issue here fit neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92. As the Supreme Court recently explained when upholding the constitutionality of the CFPB's funding mechanism, the Director's "discretion to draw less than the statutory cap," as Defendants have done here, is analogous to implementation of a "'sums not exceeding' appropriation[], which provided the Executive with the same discretion, [and was] commonplace immediately after the founding." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 436 (2024). And it is well established that "an agency's allocation of funds from a lump-sum appropriation" is presumptively outside the scope of judicial review, since "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192-93. The CFPB's "sums not exceeding" appropriation operates similarly to the type of lump-sum appropriation found unreviewable in *Lincoln*, with an important difference. Both types of appropriation commit decisions on how to allocate appropriated funds to the agency's discretion. *See id.*; *Cmty. Fin. Servs. Ass'n of Am*. 601 U.S. at 445 (Kagan, J., concurring) ("the CFPB also inherited a bank-funded scheme enabling it to allocate moneys, at its own discretion, to carry out its responsibilities"). But in the case of the CFPB's "sums not exceeding" appropriation, the Supreme Court has additionally confirmed that Congress permissibly delegated to the agency discretion over whether to spend the funds at all. *Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. at 432 ("The appropriation of 'sums not exceeding' a specified amount did not by itself mandate that the Executive spend that amount; as was the case in England, such appropriations instead provided the Executive discretion over how much to spend up to a cap.").

Defendants' determination of how much (if any) additional funding is reasonably necessary to carry out the authorities of the CFPB for this quarter, given the amounts received from the Federal Reserve already this fiscal year, requires "a complicated balancing of a number of factors which are peculiarly within its expertise: whether its resources are best spent on one program or

13

another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all." *Lincoln*, 508 U.S. at 193 (citation omitted). In requesting no additional funding for this quarter, Acting Director Vought explained that he had weighed both the amount of funds already available to the CFPB and how best to carry out the authorities of the Bureau "in a manner that is consistent with the public interest," as well as the administration's overall policy priorities of running "a substantially more streamlined and efficient bureau." Vought Letter. Instructively, the Supreme Court has analogized this type of decision to another action typically committed to agency discretion by law: "the decision against instituting enforcement proceedings." *Lincoln*, 508 U.S. at 193 (citing *Heckler v. Chaney*, 470 U.S. 821, 831-33 (1985)). Here too, the task of weighing these priorities to determine how much additional funding is warranted is inherently a policy decision, and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* (citation omitted).

Similarly, any future decision to reduce the size of the CFPB's reserve fund is intrinsically a decision about the proper allocation of a lump sum of appropriated funding, and therefore presumptively outside the bounds of judicial review. *See id.* at 191. As Acting Director Vought— like Director Mulvaney before him—explained in his letter to the Federal Reserve, "no such [reserve] fund is required by statute or necessary to fulfill the Bureau's mandate." Vought Letter. *See also* Ex. 2, *Letter from Acting Director Mulvaney to Federal Reserve Chair Janet Yellen* (January 17, 2018), https://files.consumerfinance.gov/f/documents/cfpb_fy2018_q2_funding-request-letter-to-frb.pdf. ("Mulvaney Letter") ("I know of no specific statutory authority requiring the establishment or maintenance of such a reserve. Moreover, I see no practical reason for such a large reserve, since I am informed that the Board has never denied a Bureau request for funding and has always delivered requested funds in a timely fashion."). The absence of any such requirement to establish or maintain a reserve fund "reflects a congressional recognition that an agency must be allowed 'flexibility to shift funds within a particular appropriation account so that'

14

the agency 'can make necessary adjustments for unforeseen developments' and 'changing requirements.'" *Lincoln*, 508 U.S. at 193 (cleaned up) (quoting *In re LTV Aerospace Corp.*, 55 Comp. Gen. 307, 318 (1975)).  And while Plaintiffs may take a different view of how best to allocate CFPB's existing resources, any decision that such funds would be better spent than hoarded in reserve falls comfortably within the agency's expertise as a resource allocation matter traditionally committed to agency discretion.

Second, the text of 12 U.S.C. § 5497(a)(1) plainly leaves the funding decisions at issue to Defendants' independent judgment.  *Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. at 436 (recognizing that § 5497(a)(1) grants CFPB "discretion to draw less than the statutory cap.").  For the APA to allow for judicial review in the first place, there must be "substantive" "standards limiting agency conduct which might constitute 'law to apply.'" *Chrysler Corp. v. Brown*, 441 U.S. 281, 317-18 (1979) (citation omitted).  In other words, "the APA's arbitrary and capricious standard cannot be sufficient by itself to provide the requisite meaningful standard for courts to apply in evaluating the legality of agency action." *Concilio De Salud Integral De Loiza, Inc. v. Dep't of Health & Hum. Servs.*, 538 F. Supp. 2d 139, 147 (D.D.C. 2008) (citation omitted); *Webster*, 486 U.S. at 598-601 (arbitrary or capricious review is not "law to apply").  The statutory standard for funding the CFPB is what "amount [is] determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)."  12 U.S.C. § 5497(a)(1).  And as explained above, no statute requires the establishment or maintenance of a reserve fund at all, let alone requires that such a fund maintain a specific balance. *See supra*. The language in each of these statutes "fairly exudes deference" to Defendants, and "foreclose[s] the application of any meaningful judicial standard of review." *Webster*, 486 U.S. at 600.

## D. Plaintiffs Have No APA Cause of Action Against the CFPB Because of Adequate Alternative Remedies Against Financial Sector Entities.

With certain exceptions, *see supra* at pp. 12-15, the APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. And an "adequate remedy in a court" against the "shady financial practices" that form the heart of Plaintiffs' grievances, *see* ECF No. 8-3, Declaration of Faith Leach ("Leach Decl.") ¶ 17, exists: a lawsuit in state court under the Maryland Consumer Protection Act, which provides Plaintiffs with a private right of action against entities that engage in unfair, abusive, or deceptive trade practices. Md. Code Ann., Com. Law (CL), Tit. 13. Also, Plaintiff Baltimore City has its own independent power "to take action against companies who harm Baltimore citizens through unfair, deceptive, and abusive practices." ECF No. 8-3, Leach Decl. ¶ 11. Their APA-based claims against Defendants are therefore unlikely to succeed.

Courts have established that an APA claim against a federal agency in a suit related to alleged nonenforcement of statutes and regulations governing third parties is unavailable if the plaintiff has an adequate, even if imperfect, remedy against the third parties otherwise subject to agency regulation.[3] When statutory beneficiaries can proceed directly against regulated entities, "federal courts will not oversee the overseer." *WEAL*, 906 F.2d at 748 (quoting *Coker*, 902 F.2d at 89). In that circumstance, overseeing the agency is "a role more appropriately reserved for the Executive under the oversight of Congress." *Council for the Blind*, 709 F.2d at 1532. Thus, under the doctrine, it does not matter if plaintiff's remedy against the third-party entities has "no effect upon the challenged agency action[.]" *Wash. Legal Found.*, 984 F.2d at 486 (quoting *Coker*, 902 F.2d at 90 n.5).

---

[3] *Turner v. Sec'y of U.S. Dep't of Hous. & Urb. Dev.*, 449 F.3d 536, 539-41 (3d Cir. 2006); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945-48 (D.C. Cir. 2004); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 191-92 (4th Cir. 1999); *Wash. Legal Found. v. Alexander*, 984 F.2d 483, 486 (D.C. Cir. 1993); *Women's Equity Action League ("WEAL") v. Cavazos*, 906 F.2d 742, 750-51 (D.C. Cir. 1990); *Coker v. Sullivan*, 902 F.2d 84, 88-90, 90 n.5 (D.C. Cir. 1990); *Gillis v. U.S. Dep't of Health & Hum. Servs.*, 759 F.2d 565, 575–78 (6th Cir. 1985); *Council of and for the Blind of Del. Cnty. Valley, Inc. v. Regan*, 709 F.2d 1521, 1532 (D.C. Cir. 1983); *Nielsen v. Hagel*, 666 F. App'x 225, 231 (4th Cir. 2016).

Here, the Bureau's role is to protect consumers from "unfair, deceptive, or abusive act[s] or practice[s]" with respect to a "consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531.  And Plaintiffs argue that their interest in this matter relates to their mission in helping "consumers find solutions to problems they encounter with common scams, financial exploitation, medical debt, and other financial issues," Pls.' Mot., p. 12, by encouraging consumers to submit complaints to the CFPB, *see* ECF No. 8-2, Declaration of Marceline White ("White Decl.") ¶¶ 4-5, 7-8  They allege that taking advantage of CFPB resources to assist consumers in resolving unfair, deceptive, or abusive acts or practices is convenient: "[t]he CFPB complaint system allows consumers to bring their issues directly to the agency, which then routes them to the appropriate company for a response." Pls.' Mot., p. 12.  But Maryland provides the very consumers that Plaintiffs assist with a direct cause of action against financial entities to counter unfair, deceptive, or abusive trade practices.  Md. Code Ann. CL § 13-301, *et seq*.; *see, e.g, Linton v. Consumer Prot. Div.*, 225 A.3d 456, 507 (Md. Ct. App. 2020) (noting that CFPB filed a "similar action against the same defendants, for the same misconduct, and seeking essentially the same relief" as the Consumer Protection Act claims).  And even if pursuing that remedy in state court may be less effective than utilizing CFPB resources to address shady financial practices, that does not mean that the remedy is inadequate.  *See Council of and for the Blind*, 709 F.2d at 1532; *see also WEAL*, 906 F.2d at 751 (concluding that "situation-specific litigation affords an adequate, even if imperfect, remedy" when plaintiffs allege systemic deficiencies at the federal agency level).

Plaintiffs may argue that any state law remedy is inadequate because they are asserting some form of informational injury.[4]  But efforts to evade the APA's adequate remedy doctrine by fashioning interests as informational or by substituting organizational plaintiffs for the individuals that they assist have been rejected.  In *Coker*, the anti-homelessness organizational plaintiffs complained that an agency's alleged noncompliance with statutory mandates "injured" them

---

[4] Article III severely limits the circumstances in which an action can proceed based on that type of injury.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441-42 (2021).

"because they ha[d] been deprived of information they could use" to advance their organizational missions. 902 F.2d at 90 n.6. Then-Judge Ruth Bader Ginsberg rejected that argument in a footnote. *Id.* She explained that the informational deprivation only hindered the organizations' goals because of the third-party regulated entities' (in that case, state governments) failure to comply with the substantive statutory or regulatory duty at issue. *Id.* The same is true here. Plaintiffs use CFPB information as part of their efforts to assist consumers with their claims against third-party financial entities who may have committed "scams and other unlawful financial practices." Pls.' Mot., p. 13. *See, e.g., id.* at 12 (Economic Action assists consumers with "problems they encounter with common scams, financial exploitation, medical debt, and other financial issues); ECF No. 8-2, White Decl. ¶ 4 (Economic Action uses CFPB educational materials "to inform older adults about scams and to encourage them to submit complaints"). Those financial practices sound in the nature of unfair, deceptive, or abusive acts or practices under both the CFPA and Maryland consumer law.[5]

It does not matter that the alternative private right of action remedy arises in state court under state law. The *Coker* court found that "[s]tate court actions" could serve as the basis for the adequate remedy. 902 F.2d at 90. That is especially so here given that Congress explicitly contemplated that state consumer protection law would continue to provide consumers with an adequate—if not greater—remedy than what the CFPA and CFPB provides. 12 U.S.C. § 5551(a)-(b). Moreover, the plain language of the APA does not limit the adequate remedy to actions in federal court or remedies arising under federal law. 5 U.S.C. § 704 (referring to "no other adequate remedy in a court" of any kind (emphasis added)).

---

[5] And insofar as Plaintiffs suggest that their informational injury is unrelated to these direct services interests, they lack Article III standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (agency action that would cause organizations to conduct its own studies "so that [they] can better inform . . . the public" insufficient for standing); *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (mere interest in a problem insufficient for Article III standing).

18

**E.  The CFPA Does Not Foreclose the Vought Letter.**

Even if Plaintiffs could overcome the threshold defects of their claims, they are unlikely to succeed on the merits of their claim that the CFPA, 12 U.S.C. § 5497(a)(1), foreclosed the Vought Letter.  See Pls.' Mot at 10.  By providing that the Federal Reserve shall transfer to CFPB "the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law, taking into account such other sums made available to the Bureau from the preceding year (or quarter of such year)[,]" 12 U.S.C. § 5497(a)(1), Congress "expressly delegate[d]" to the Director the authority to decide the amount of funding that should be available to the CFPB.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (citation omitted); *see also id.* at 395 (referencing statutes using "a term or phrase that 'leaves agencies with flexibility'" such as the term "'reasonable'" (citation omitted)).  The statute grants the Bureau "discretion to draw less than the statutory cap."  *Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. at 436.  And nothing in the text of section 5497 purports to limit that broad grant of discretion to exclude the Director from requesting zero dollars in funding for a particular fiscal quarter or year when he determines that the existing balance of funds is sufficient to carry out its authorities under law.  In fact, the text explicitly instructs the Director to take into account the sums made available in the previous year or quarter.  Therefore, by its plain terms, section 5497 authorizes the Vought Letter, which considers the hundreds of millions of dollars in reserves to be adequate to fund the CFPB.

Because there is no basis to conclude that the Vought Letter is invalid, Plaintiffs instead attack an abstract "determination that no money is necessary" to carry out Bureau authorities.  Pls.' Mot., p. 10.  But, again, Plaintiffs' brief does not cite any agency action making any such determination.  They are thus unlikely to succeed on this claim.

**F. In Fashioning the Vought Letter, and as Part of Defendants' Ongoing Decision-Making, Defendants Have Made and Are Making Reasonable Judgments.**

Plaintiffs are likewise unlikely to succeed on the merits of their arbitrary and capricious claim. "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness[.]" *Id.* "[R]eview under the 'arbitrary and capricious' tag line . . . encompasses a range of levels of deference to the agency," *Am Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4-5 (D.C. Cir. 1987), and agency action regarding reallocation of resources, if reviewable at all, must be afforded highly deferential rational basis review, *cf. Lincoln*, 508 U.S. at 193. In reviewing agency action that is not subject to the notice and comment requirements of the APA, the Fourth Circuit has held that the agency action must be upheld if "any reasonable basis can support" the action. *McDaniels v. United States*, 300 F.3d 407, 412 n.2 (4th Cir. 2002).

In evaluating whether an agency action is arbitrary and capricious "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Fed. Energy Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Instead, agency action will be deemed arbitrary and capricious only "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S.. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "The APA imposes no general obligation on agencies to produce empirical evidence. Rather, an agency has to justify its [action] with a reasoned explanation." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (Kavanaugh, J.). The reasons for the agency action may be provided "through affidavits[.]" *Camp v. Pitts*, 411 U.S. 138, 143 (1973). *See Clifford v. Pena*, 77 F.3d 1414, 1418 (D.C. Cir. 1996). "[A] reviewing court must 'uphold' even a 'decision of less than ideal clarity if the agency's path may reasonably be

discerned.'" *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) (citation omitted).  A plaintiff has the burden of proving that the agency action was arbitrary and capricious.  *See Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010); *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002).  Plaintiffs' objections come nowhere close to meeting the high bar this standard sets.

Acting Director Vought reasonably determined that the hundreds of millions of dollars in funding already on hand is sufficient to support the agency's operations and statutory obligations.  As he explained in his letter, CFPB's "current funds are more than sufficient—and are, in fact, excessive—to carry out its authorities in a manner that is consistent with the public interest."  Vought Letter.

To be sure, that determination reflects a change from amounts deemed reasonably necessary in the prior administration.  But "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs[.]"  *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1043 (D.C. Cir. 2012) (citation  omitted).  In no way does a different perspective on the amount needed to support the agency's statutory obligations reflect a determination that the agency will not fulfill those obligations, as Plaintiffs repeatedly suggest.  Ex. 1, Gueye Decl. ¶¶ 14, 18-20.  Rather, determining that existing funds are sufficient "to carry out" the agency's statutory "authorities," Vought Letter, necessarily contemplates that the agency will fulfill its statutory obligations on behalf of consumers.  Accordingly, Plaintiffs have not shown that the agency "entirely failed to consider," *State Farm*, 463 U.S. at 43, the interests of consumers when balancing the interests underlying its determination that the hundreds of millions of dollars in the Bureau's existing funds are sufficient to discharge the agency's obligations.  Ex. 1, Gueye Decl. ¶¶ 8-14.  The agency has more than satisfied the minimal level of analysis required, *Garland*, 593 U.S. at 369, especially in this context, *cf. Lincoln*, 508 U.S. at 193.

In any event, Plaintiffs' arguments, Pls.' Mot., pp. 8-9, fail at the outset because they display a fundamental "lack of understanding" of "the nature of the" challenged decision-making.

*Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978).
Consider first Plaintiffs' contention that the agency's purported ongoing consideration of whether
"to transfer the CFPB's operating reserve after drawing $0 in funding for the next quarter" is
arbitrary and capricious. Pls.' Mot., p. 8. Plaintiffs contend that this process is arbitrary "because
it takes no account of" harms that might result from "shutting down" the CPFB. *Id.* at pp. 9-8
(arguing that leaving the agency unable to carry out its mission would be an abuse of discretion).
Plaintiffs seemingly believe that the agency's ongoing consideration of whether to reduce the
CFPB's $220 million reserve fund by an undetermined amount will mean that the agency will have
no resources to carry out its statutory obligations. *Id.* But that assumption is baseless. Ex. 1,
Gueye Decl. ¶¶ 8-14. The reserve fund is merely one component of the Bureau's available funds.
*Id.* ¶¶ 4-5, 8, 15-17. And, more importantly, Plaintiffs seemingly misunderstand what it means to
reduce the reserve fund. Reducing the excess in the reserve fund means that the reserve balance
would be transferred as part of the CFPB's internal finances to an operating balance within the
Bureau Fund. *Id.* ¶ 15. So reducing the reserve fund would only increase the amount of funds
readily available for the CPFB to carry out its statutory authorities—it would not result in "shutting
down." Pls.' Mot., p. 8. And insofar as Plaintiffs' arguments are premised on speculation that the
agency intends to "transfer" the reserves back to the Federal Reserve, *see id.*, Plaintiffs have failed
to demonstrate that there is even a mechanism for the Bureau to do any such thing, Ex. 1, Gueye
Decl. ¶ 16.

**II.    Plaintiffs Do Not Face Irreparable Harm Justifying Extraordinary Remedies.**

Apart from their failure to show a likelihood of success on the merits, Plaintiffs cannot show irreparable harm. *See Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (requiring a "clear showing" of likelihood of irreparable harm). Plaintiffs' showing on this essential element fails because they have not shown harm of the magnitude necessary to justify extraordinary emergency relief.

First, all of Plaintiffs' allegations of irreparable harm stem from their speculation that the CFPB complaint database and other informational materials will be unavailable. Pls.' Mot., pp. 12-14. But Plaintiffs provide no evidence, because there is not any, that Acting Director Vought's letter to Chairman Powell means these materials will be unavailable. *See* Ex. 1, Gueye Decl. ¶¶ 18-20. Their arguments are premised on baseless speculation that the CFPB will make decisions about the Bureau's funding mechanisms making it impossible for the agency to maintain essential functions. *But see* Ex. 1, Gueye Decl. ¶¶ 3-17.

In any event, consistent with the "characterization of injunctive relief as an extraordinary remedy," *Winter*, 555 U.S. at 22, "[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Private Postsecondary Schs. v. Devos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018). Rather, the injury must be "great" in magnitude. *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). *See, e.g., Standard Oil*, 449 U.S. at 244. Plaintiffs' authorities premised on standing, not irreparable harm, are thus of little help to them. *See, e.g., Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 396 (4th Cir. 2024) (addressing standing, not irreparable harm justifying an injunction). If the standards were equated, then every lawsuit against the Government "even [for] as little as $1" would provide a basis for extraordinary

emergency relief.  *See Air Transp. Ass'n of Am.. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).[6]

Plaintiffs' declarations are insufficient to show a great injury necessary to satisfy these standards.  Leach declares in a conclusory fashion that not having access to the CFPB complaint database would make some Baltimore city operations "less efficient" and require the city to reallocate resources.  ECF No. 8-3, Leach Decl. ¶¶ 15-16.  Similarly, White asserts that Economic Action counselors "would need to devote more time and resources" to their work.  ECF No. 8-2, White Decl. ¶ 8.  But neither Plaintiff provides any evidence placing those losses "in the context of [its] overall finances."  *Nat'l Council of Agric. Emps. v. U.S. Dep't of Labor*, Civ. Action No. 22-2569, 2023 WL 2043149, at *7 (D.D.C. Feb. 16, 2023).  And in the absence of evidence showing that the "expense is disproportionate" to those finances, more resource-intensive investigations or counseling do "not justify [an] injunction[.]"  *Petroleum Expl. v. Pub. Serv. Comm'n of Ky.*, 304 U.S. 209, 220-21 (1938).

What is more, the Supreme Court has held that expenses associated with addressing a dispute are precisely the type of costs that do not qualify as irreparable harm.  *See, e.g., Standard Oil*, 449 U.S. at 244 ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury" (citation omitted)).  And Plaintiffs' characterizations aside, both Plaintiffs complain of increased expenses associated with addressing consumers' disputes with financial companies—not meaningfully different from litigation expenses insufficient to show irreparable injury.  *See id*.  *Compare Petroleum Expl.*, 304 U.S. at 220 (considering "expense in preparing for and carrying out an investigation"), *with*, ECF No. 8-3, Leach Decl. ¶ 15 ("Baltimore

---

[6] For this reason, *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016), cannot be understood to equate the standard for irreparable harm and the standard for organizational standing derived from *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), as Plaintiffs suggest.  Pls.' Mot., p. 11.  Moreover, Plaintiffs misstate the standard for standing described in *Havens*.  In that case, the Court found that a plaintiff had standing when the challenged conduct "perceptibly impaired" the plaintiff's ability to provide counseling services combined "with the consequent drain on the organization's resources[.]"  455 U.S. at 379.  These are not two alternative paths for an organization to show injury-in-fact, let alone irreparable injury.  *See* Pls.' Mot., p. 11.

enforcement officials will be forced to conduct additional research that will take time away from other work.")

Plaintiffs' authorities are inapposite. For example, in *HIAS, Inc. v. Trump*, the court relied on an "onerous . . . diversion of resources away from" plaintiffs' "core missions." 985 F.3d 309, 326 (4th Cir. 2021). But it also emphasized as "[m]ore consequent[ial]" the fact that plaintiffs' affiliates would "have to cease their resettlement work" entirely, making it likely that they would not "survive" the challenged policy change. *Id.* Plaintiffs fail to show that they are certain to experience anything close to that type of injury during the pendency of this litigation.

## III.    The Equities and Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—tilt decisively against granting a preliminary injunction here. Plaintiffs have not made any showing of substantial irreparable injury of the nature that would warrant extraordinary intervention by a court of equity. Against Plaintiffs' lackluster showing of harm weighs the significant public interest in permitting Defendants to carry out their statutory responsibilities consistent with the philosophy of a new administration brought about by a national election. Again, "[a] change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs[.]" *Nat'l Ass'n of Home Builders*, 682 F.3d at 2043 (citation omitted).

Here, Congress vested in the Director the duty to determine the amount of funds "reasonably necessary to carry out the authorities of the Bureau." 12 U.S.C. § 5497(a)(1). Especially insofar as Plaintiffs are seeking an order that would preclude Defendants from operationalizing any amount of "the Bureau's reserve funds," Pls.' Mot., p. 15—effectively freezing them in place, *see* Ex. 1, Gueye Decl. ¶ 15—Plaintiffs' requested order would enjoin the Government from effectuating the plain language of the statute. And "[a]ny time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

25

chambers) (citation omitted). Any such injunction would undoubtedly interfere with the public interest in ensuring that federal funds are managed judiciously and efficiently.

**IV.    The Requested Injunction Fails the Specificity Requirements of Rule 65(d)(1).**

Plaintiffs' request to enjoin Defendants from "taking any steps to defund" the agency, Proposed Order, p. 1, fails to meet the requirement that an injunction "state its terms specifically" and "describe in reasonable detail . . . the act or acts restrained[.]" Fed R. Civ. P. 65(d)(1)(B)-(C). Consistent with Plaintiffs' complete failure to challenge a concrete agency action that they are seeking to enjoin, it is unclear if the terms of the proposed order are designed to (1) only preclude the agency from eliminating its funds in their entirety (reducing them to zero), while permitting the agency to reduce those funds to an amount that the Director determines is reasonably necessary to carry out the authorities of the Bureau; or (2) preclude the agency from transferring any funds from the agency's operating reserves, even if the Director determines that they exceed an amount reasonably necessary to carry out the authorities of the Bureau (and even though the CFO is unaware of any mechanism for the Bureau to do any such thing, Ex. 1, Gueye Decl. ¶ 16).

**CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

DATED: February 20, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Principal Deputy Assistant Attorney General

                                            PHILIP A. SELDEN
                                            Acting United States Attorney

                                            BRAD P. ROSENBERG
                                            Special Counsel

                                            */s/ Liam C. Holland*
                                            LIAM C. HOLLAND (*Admitted in New York*)
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street, N.W.

26

Washington, DC 20005
Tel: (202) 514-4964
Fax: (202) 616-8470
Email: liam.c.holland@usdoj.gov

Beatrice C. Thomas (Bar No. 21969)
Assistant United States Attorney
36 South Charles Street, 4th Floor
Baltimore, Maryland 21201
410-209-4848
beatrice.thomas@usdoj.gov

*Counsel for Defendants*