IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MAYOR AND CITY COUNCIL OF
BALTIMORE, et al.,

*Plaintiffs*,

vs.

CONSUMER FINANCIAL
PROTECTION BUREAU, et al.,

*Defendants*.

Case No. 25-cv-458-MJM

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR A PRELIMINARY INJUNCTION**

The administration has made no secret of its goal to dissolve the CFPB. The week of February 10, they moved to carry out their plan, deciding to transfer away the CFPB's reserve funds imminently. Following their draw of $0 in new funding for all of fiscal year 2025, that transfer would leave the CFPB without funds necessary to carry out its critical statutory responsibilities. In response to this suit, Defendants notably do not dispute that they made a decision to transfer CFPB funds outside the agency's control—only that they have not yet identified a mechanism for sending funds *to the Federal Reserve*. But whether sent to the Fed, to Treasury, or elsewhere, the gravamen of Plaintiffs' claims is the same. Defendants also cavil over the exact amount they intend to transfer away. But Defendants have made clear their plan to shut down the CFPB, and even if, as they claim, they seek to transfer "only" $220 million, they have not shown that would leave the CFPB with enough money to carry out its required duties—rather, the opposite.

The Court should enter a preliminary injunction to halt Defendants' unilateral defunding of the CFPB and prevent the irreparable harm that would result by ensuring the CFPB retains sufficient funds to carry out its important statutory obligations. In the alternative, if the Court has any doubt as to the exact nature of Defendants' decision to defund the agency, it should hold the present motion in abeyance, enter a TRO keeping in place the parties' agreed relief, and order limited expedited discovery on that question.

## BACKGROUND

The administration has openly announced its goal to shutter the CFPB. President Trump said it is "very important to get rid of" the agency, Compl. ¶ 38; Elon Musk tweeted "Delete CFPB"[1]; and before the election Defendant Vought led an effort calling for the

---

[1] Elon Musk (@elonmusk), X (Nov. 27, 2024), https://tinyurl.com/29zsmdyy.

immediate dissolution of the agency, Compl. ¶ 28. The administration's assault on USAID shows these are not idle threats. Over the course of days, DOGE affiliates seized that agency's data, contractors were laid off or furloughed, the agency's website was taken down and its name literally pried off the face of its headquarters building, staff were placed on administrative leave, and the work of the agency effectively ceased.[2] Musk boasted that he had spent a weekend "feeding USAID into the wood chipper."[3]

On Friday, February 7, 2025, the administration came for the CFPB. DOGE affiliates arrived at CFPB headquarters demanding access to data systems. The next day, Defendant Vought told staff to "[s]tand down from performing any work task." Compl. ¶ 30. Separately, he stated that "no additional funds are necessary to carry out the authorities of the Bureau for Fiscal Year 2025" and that "no" reserve fund was "necessary to fulfill the Bureau's mandate." Defs.' Ex. 1B. Musk commented on the reserve: "CFPB has $711M? That money should be returned to taxpayers."[4] On Sunday, February 9, CFPB employees were barred from the headquarters. Over the next few days, and just as at USAID, probationary employees and contractors were terminated, key services were discontinued, the CFPB homepage was replaced with a "404" message, and most staff were ordered to stop work.[5] Plaintiffs were forced to file this action and seek emergency relief to stop Defendants' unilateral defunding of the agency. Even following that filing and another court's entry of an order limiting Defendants' ability to attack the CFPB, *NTEU v.*

---

[2] *See, e.g.*, Karoun Demirjian et al., *Trump Appointees to Put Almost All U.S.A.I.D. Workers on Leave*, N.Y. Times (Feb. 4, 2025), https://tinyurl.com/4uctckna.
[3] Elon Musk (@elonmusk), X (Feb. 3, 2025), https://tinyurl.com/424t3xnc.
[4] Elon Musk (@elonmusk), X (Feb. 10, 2025), https://tinyurl.com/5xvv3knd.
[5] *See, e.g.*, Christopher Rugaber, *Trump Administration Orders Consumer Protection Agency to Stop Work, Closes Building*, AP News (Feb. 9, 2025), https://tinyurl.com/46ebzj44; Evan Weinberger, *CFPB Fires 70 Enforcement Lawyers, Other Probationary Employees*, Bloomberg Law (Feb. 11, 2025), https://tinyurl.com/562uy2yv.

*Vought*, No. 25-cv-00381 (D.D.C. Feb. 14, 2025), ECF No. 19, Defendant Vought has nevertheless continued dismantling the CFPB, removing the agency's name from its building, reportedly terminating its lease, and placing most staff on administrative leave.[6]

According to Defendants, the CFPB maintains funds in (1) a "Bureau Fund" and (2) the civil penalty fund. Gueye Decl. ¶ 3. The latter contains money the CFPB has collected as penalties in civil enforcement cases. Because money in the civil penalty fund cannot be used to pay the ordinary operating expenses of the CFPB, *see* 12 U.S.C. § 5497(d)(2), it is irrelevant here. This case instead addresses the Bureau Fund, which contains the money transferred by the Federal Reserve and is used to fund the CFPB's operations. *Id.* § 5497(c); Gueye Decl. ¶ 3. Per Defendants, it contains both obligated and unobligated funds, including, as of February 8, roughly $412 million in unobligated monies. *Id.* ¶¶ 4, 8, Ex. 1A. Of that $412 million, the CFPB has designated $220 million as its "operating reserve" and the remaining roughly $192 million as its "operating balance." *Id.* Defendants aver that their projected expenses for the rest of fiscal year 2025 are $264,100,000—significantly more than the operating balance will cover. *Id.* ¶ 17.

## ARGUMENT

Plaintiffs have shown their entitlement to a preliminary injunction. Defendants' decision to defund the Bureau is final agency action subject to review under the Administrative Procedure Act and is ripe for review. That decision is arbitrary, capricious, and contrary to law. If left undisturbed, it will irreparably harm Plaintiffs.

---

[6] Stacy Cowley, *A Consumer Bureau Is Told to Vacate Its Washington Office as Its Lease Is Canceled*, N.Y. Times (Feb. 21, 2025), https://tinyurl.com/2wc876tp; Abha Bhattarai, *Layoffs Halted at CFPB for Now as Judge Considers Union's Lawsuit*, Wash. Post. (Feb. 15, 2025), https://tinyurl.com/4dhapz6b.

I.      **Plaintiffs are likely to succeed on the merits.**

   A.   **A decision to defund an agency is final agency action.**

The decision of an agency head to defund his own agency is a final agency action subject to review under the Administrative Procedure Act. And that is precisely what Plaintiffs allege Defendant Vought has done: decided, fully and finally, to defund the CFPB by transferring away its funds while also requesting transfers of $0 for the rest of fiscal year 2025. *See* Compl. ¶¶ 41, 61, 64, Prayer for Relief. Defendants go to great lengths to argue that Defendant Vought's letter to the Fed is not final agency action. But as Defendants concede, "Plaintiffs do not challenge that discrete document," Opp'n at 6, and "do not allege any injury due to the Vought Letter alone." Opp'n at 9.[7] Defendant Vought's letter is *evidence* of the final agency action Plaintiffs challenge, not the action itself.

A decision to defund an agency is a discrete decision, and Plaintiffs' challenge to that decision is not a "generalized complaint[]." *See Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006). The CFPB's decision to defund itself—at this specific point in time— is a far cry from "an on-going program or policy." *Id.* (citation omitted). To the contrary, it is a decision which will end any ongoing programs. Nor would review of this discrete question subject ordinary CFPB funding decisions to "paralyzing" judicial review, *contra* Opp'n at 10; at most, it would permit judicial review of future funding decisions that would similarly zero out the CFPB's operating funds.

The defunding decision is likewise final: It "mark[s] the consummation of the [Defendants'] decisionmaking process"—rather than being "merely tentative or

---

[7] To be clear, Plaintiffs take no position—and this Court need not either—on whether the Director could lawfully request $0 in operating funds where the CFPB has adequate reserves to continue operations, or whether the Director could lawfully transfer away the CFPB's reserve funds so long as he continued to request quarterly transfers sufficient to continue CFPB operations.

4

interlocutory"—and is a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997)).

Under 12 U.S.C. § 5497(a)(1), the head of the CFPB has the authority to determine the CFPB's operational budget needs and to request the money required to meet those needs. Once he reaches a decision on the CFPB's budget, the agency's decisionmaking process is inherently complete, because there are no other participants in the process. *See Nat'l Automatic Laundry and Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971) (agency head approval of an agency action is a "signpost[] of authoritative determination, finality[,] and ripeness").

Further, a decision to *de*fund the CFPB necessarily carries legal consequences, including the inability of the CFPB to comply with statutory requirements. *See* Compl. ¶¶ 9–18 (listing some required functions). These obligations cannot be met without funds; defunding the CFPB necessarily means the CFPB will fail to meet these obligations.

Defendants imply (at 6) that the APA does not permit review of "abstract" decisions. But there is nothing abstract about the decision to transfer away the CFPB's funds. And Defendants err in their reliance on *Biden v. Texas*, 597 U.S. 785 (2022), where an agency issued a memorandum effectuating an agency decision. The Supreme Court treated the memorandum, rather than the preceding decision, as the final agency action, but did not conclude that memorialization was required. In contrast, in *Venetian Casino Resort, L.L.C. v EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008), the D.C. Circuit treated an agency's adoption of a policy as a reviewable final agency action, even though the policy was also subsequently memorialized in a memorandum. And here, where Plaintiffs successfully

5

stepped in to prevent Defendants from effectuating their decision, it is unsurprising that the decision has not been memorialized. If Defendants mean to suggest that the irregular *form* of the final agency action—having not been reduced to writing (at least not publicly available writing)—somehow excludes it from the APA's ambit, that argument fares no better. "Agency action . . . need not be in writing to be final and judicially reviewable," *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 184 (D.D.C. 2015), so long as it satisfies the *Bennett* factors. Such agency action is reviewable even when it is ascertainable only by inference from other evidence. *See*, *e.g.*, *id.* at 176 (inferring existence of government policy from consistent pattern of government conduct and treating policy as final agency action despite government's position that no such policy existed); *Florida v. United States*, 2022 WL 2431414, at *10 (N.D. Fla. May 4, 2022) (same).

Related to their claims about final agency actions, Defendants dispute how they will effectuate the defunding decision. They repeatedly emphasize, for example, (at 4, 6, 8) that they have not yet attempted to and do not yet know how to return the CFPB's funds *to the Federal Reserve*. But the ultimate destination of the intended transfer—whether to the Fed, Treasury, or elsewhere—is irrelevant to the substance of Plaintiffs' claims. *See, e.g.*, Compl. at 2 ("Defendants are poised to transfer away those operating reserves, leaving the CFPB defunded"), ¶ 61 (describing "transferring the existing reserve" without reference to destination). Defendants never deny they are preparing to transfer funds outside CFPB control or that they have identified the means to do so—including by

remitting funds to Treasury, which Defendants already have the ability to do.[8]

Similarly, Defendants dispute just *how much* money they intend to transfer. They suggest—implausibly, particularly in light of the Vought Letter's express reference to $711 million and Musk's subsequent call to return "$711 million" to taxpayers—that the "reserve fund" that Defendant Vought described as unnecessary to the CFPB's operations meant to refer only to the $220 million "operating reserve" (which is only a portion of the CFPB's unobligated funds). Opp'n at 3; *see also* Gueye Decl. ¶¶ 8, 13, Ex. 1A.

But even if true, that would leave the CFPB with insufficient funds to meet even Defendants' own (unsupported) description of their projected expenses: Defendants say that the CFPB's present projected expenses are around $132 million for the third quarter, and another $132 million for the fourth. *Id.* ¶ 17. While there are sufficient funds in the "operating balance" to cover one quarter, Defendants have not shown those funds could cover two—even on their own unsupported description of need. And notably, the projections Defendants now offer are significantly less than the $188,786,000 in expenses that the CFPB incurred on average in each quarter of fiscal year 2024 in order "to carry out the authorities of the CFPB under federal financial consumer law." CFPB, *CFO Quarterly Report: Q4 FY2024* 1-2, https://tinyurl.com/ycx9utab. Even taking Defendants' current projections at face value, in the absence of a further transfer from the Fed—which Defendant Vought has already disavowed for fiscal year 2025, *see* Defs.' Ex. 1B—the CFPB will run into a deficit. The fact that the CFPB may not eliminate its budget overnight does not mean that the decision to do so is not final, or that the legal consequences that

---

[8] *See, e.g.*, Consent Order ¶ 80, *CFPB v. Goldman Sachs Bank USA*, No. 2024-CFPB-0011, 2024 WL 4925345 (CFPB Oct. 23, 2024) (providing that "if funds remain after the [payment to consumers of] additional redress is completed, the Bureau will deposit any remaining funds in the U.S. Treasury").

flow from that decision are any less serious.

### B. Plaintiffs' claims are ripe.

Precisely because Defendant Vought has *already* made a decision to defund the CFPB, Plaintiffs' claims are ripe. Those claims are not premised on the idea (as Defendants would have it) that the CFPB "intends" to make a decision in the future, Opp'n at 11, but on the reality that it has already made that decision. The decision is not speculative, it is complete—and nothing in the declarations submitted by Defendants denies that it has occurred. This is not a case where those mechanisms' "future impact 'remains wholly speculative.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)).

Plaintiffs need not wait for Defendant Vought to carry out his decision—with its irrevocable consequences—to seek review. Indeed, Defendants do not dispute that claims challenging a decision to defund the CFPB are fit for review once that decision is made, or contend that courts must wait until they have actually been effectuated. Ripeness doctrine requires only that Plaintiffs face "impending" injury; it does not require "parties to operate beneath the sword of Damocles until the threatened harm actually befalls them." *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 390 (M.D.N.C. 2019) (quoting *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013)). Rather, "ripeness can rest on anticipated future injury." *Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 295 (4th Cir. 2022). Unable to grapple with that doctrine head-on, Defendants rely on authority suggesting that the theoretical loss of a new future benefit, or the adoption of a regulation that limits future eligibility for benefits, are inadequate to establish hardship for ripeness analysis. *See* Opp'n at 11–12 (citing *Wyoming v. Zinke*, 871 F.3d 1133 (10th Cir. 2017) and *Reno v. Cath. Soc.*

*Servs., Inc.*, 509 U.S. 43 (1993)). But here, Plaintiffs complain of something different: the loss of statutorily guaranteed protections and services.[9]

### C. There is no other barrier to this Court's review under the APA.

Defendants likewise claim that APA review is unavailable because the relevant actions are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), and because there exist alternative "adequate remed[ies] in a court," *id.* § 704. Defendants are wrong.

Courts apply "a strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 575 U.S. 480, 486 (2015) (cleaned up). The exception for actions committed to agency discretion "is a 'very narrow one,' reserved for 'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).

That's not this case. The relevant statute, 12 U.S.C. § 5497(a)(1), gives the Director significant but not unlimited discretion to determine the CFPB's funding. He may request such an amount—up to a cap—as is "reasonably necessary to carry out the authorities of the [CFPB] under Federal consumer financial law, taking into account such other sums made available to the [CFPB] from the preceding year (or quarter of such year)." The term "Federal consumer financial law" means the laws the CFPB is charged with administering, including the Consumer Financial Protection Act (CFPA) itself. *Id.* § 5481(14). Those laws in turn set out specific authorities and duties of the CFPB. *See, e.g.*, Compl. ¶¶ 9–18.

---

[9] Defendants state that the CFPB "is maintaining" its consumer complaint database, website, and telephone number, and "is providing" resources to compile information about applications for mortgage loans. Gueye Decl. ¶¶ 19–20. This is cold comfort to Plaintiffs, who do not dispute that the CFPB *presently* provides these services, but brought this suit to ensure that it continues to do so (and after one of these services—the consumer complaint phone line—was at least temporarily shut down, Moore Decl. ¶¶ 3–6).

9

The Court thus has clear "law to apply" here. *Inova Hosp.*, 244 F.3d at 346. While the Director has wide latitude to determine the agency's funding needs, the statute plainly does not allow him to unilaterally starve it of funds to the point it can no longer "carry out [its] authorities . . . under Federal consumer financial law." 12 U.S.C. § 5497(a)(1).[10] This case is thus like *Mach Mining, LLC v. EEOC*, in which the Supreme Court concluded that a statute giving broad discretion to an agency still contained clear directives for courts to police. 575 U.S. at 488 ("Yes, the statute provides the EEOC with wide latitude . . . [b]ut no, Congress has not left *everything* to the Commission.").

This case is entirely *unlike Lincoln v. Vigil*, which held unreviewable an agency's allocation of a lump-sum appropriation toward various legitimate uses. 508 U.S. 182 (1993). Plaintiffs do not challenge a decision by the CFPB about what to spend money on; they challenge action that will, by design, leave the CFPB with insufficient funds to carry out its required functions, in violation of clear statutory directives, *see, e.g.*, Compl. ¶¶ 9–18; *infra* Part III. As explained, *supra* at 4, resolving that claim does not mean exposing the CFPB to second-guessing whenever it draws funds in the ordinary course.

Defendants' assertion that Plaintiffs have "other adequate remed[ies]" is even weaker. They say (at 16–18) that Maryland Economic Action and the city of Baltimore can simply sue all the financial scammers themselves. This "doubtful and limited relief" offers cold comfort and "is not an adequate substitute for review." *Bowen v. Massachusetts*, 487 U.S. 879 (1988). Reliance on alternate enforcement "is plainly not the kind of special and adequate review procedure that will oust a district court of its normal jurisdiction under the

---

[10] Indeed, the CFPB has previously taken the position in litigation that the Director could request a transfer of $0 "only if he determined that it would reasonably allow the Bureau to carry out its duties—presumably because the Bureau had significant cash on hand already." Appellee Br., *CFPB v. Law Offices of Crystal Moroney, P.C.*, 2021 WL 2315225, *27 (2d Cir. June 4, 2021) (internal citation omitted).

10

APA." *Id*. at 904 (cleaned up). Further, Defendants' reliance on this supposed alternate remedy ignores, among other things, the vast gulf in resources and legal authorities between Plaintiffs and the CFPB. It also misunderstands the vital role the CFPB plays—which is not limited to directly enforcing consumer laws—and the irreparable harm that would be caused if the agency were deprived of the funds necessary to carry out that role. As detailed in the declarations, for example, the CFPB provides important direct services in the form of its consumer complaint hotline and makes available numerous irreplaceable informational resources such as the public databases of consumer complaints and mortgage data. White Decl. ¶¶ 7–12; Leach Decl. ¶¶ 13–15. Plaintiffs and many others rely on these services to carry out core aspects of their mission, and they cannot be replaced by simply suing companies that violate state and municipal laws.

### D. Plaintiffs are likely to show that the challenged action is unlawful.

Defendants also fail to refute Plaintiffs' showing that they are likely to succeed on the substance of their claims. Defendants' argument on statutory authority is largely the same as their argument that funding decisions are committed to agency discretion, Opp'n at 19, and falls flat for the same reason. The Director has discretion with respect to the CFPB's funding needs, but that discretion has outer limits that courts are fully capable of policing. When Defendants exceed those limits, they exceed their authority under the statute. Defendants further err in focusing solely on the Vought letter. *See id*. To be clear: Plaintiffs do not allege that it is unlawful for the Director to request $0 *when the agency maintains sufficient reserves*; they allege—consistent with CFPB's own past position, *see supra* at 10—that it is unlawful to transfer away reserves while drawing $0 in new funds, where this transfer leaves CFPB unable to meet its obligations.

11

Defendants likewise misstate the nature of the action being challenged in arguing that they have acted rationally. They defend the reasonableness of simply moving an unidentified portion of the CFPB's reserves "to an operating balance within the Bureau fund." Opp'n at 22. But Plaintiffs neither allege nor challenge the CFPB moving money internally between accounts under its control.[11] Plaintiffs challenge the transfer of financial reserves away from the CFPB—whether to the Fed, Treasury, or wherever they will be unavailable to the CFPB—thus carrying out the President's stated goal of "get[ting] rid of" the agency, Compl. ¶ 38, and effectuating Acting Director Vought's view that "no" reserves are "necessary to fulfill the Bureau's mandate," Defs.' Ex. 1B. Defendants do not even try to defend the rationality of *that* action, which is arbitrary and capricious on its face, including because it would leave the CFPB unable to carry out its required functions.

## II.  Plaintiffs face irreparable harm absent relief.

As set forth in Plaintiffs' opening brief, they stand to suffer irreparable harm because the CFPB's defunding would "make it more difficult for [them] to accomplish their primary mission," such as direct-services work for people suffering from scams or abusive financial practice. *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)[12]; White Decl. ¶¶ 3–8, 12–14; Leach Decl. ¶¶ 10–12, 14–17. Having to "divert resources in the absence of [preliminary] relief is enough to satisfy their burden of showing a likelihood of suffering irreparable harm." *Action NC v. Strach*, 216 F. Supp. 3d 597, 643 (M.D.N.C. 2016). For the reasons explained above, *see supra* at 5, 11, these injuries are

---

[11] Defendants' suggestion that "reducing the excess in the Reserve Fund means that the Bureau's operating balance increases," Gueye Decl. ¶ 15, thus entirely misses the point.
[12] Defendants suggest (at 24 n.6) that this Court cannot understand *Newby* to mean what it plainly says. But Defendants offer no rationale; much as they may prefer to argue that Plaintiffs conflate the analysis for standing and irreparable harm, *Newby* quite clearly addresses the latter. 838 F.3d at 7–9.

not speculative, but are certain to occur should CFPB unilaterally defund itself.

Unable to dispute this logic, the government instead attempts (at 23–24) to recharacterize the irreparable injury analysis as primarily economic in character. This is incorrect. Another court in this district, for example, has previously found that Baltimore suffered an irreparable injury where an agency action would (among other things) "drive patients to Baltimore City health systems, placing greater demands on their capacity and ability to provide service." *Mayor and City Council of Baltimore v. Azar*, 392 F. Supp. 3d 602, 618 (D. Md. 2019). So too here, where CFPB ceasing to provide essential services (a direct and obvious consequence of its defunding) would require Baltimore "to divert resources from other essential functions just to provide the same level of protection that residents enjoy now." Leach Decl. ¶¶ 15, 17; *see also* White Decl. ¶¶ 10, 12–15 (noting, among other irreparable harms, that "CFPB provides lots of resources that simply aren't available anywhere else" and that "[t]here is no replacement").

Defendants mischaracterize Plaintiffs' injury as mere "expenses associated with addressing a dispute." Opp'n at 24. This, too, stems from a crabbed reading of the declarations Plaintiffs provided. *See* White Decl. ¶¶ 4–6, 11–14; Leach Decl. ¶¶ 14, 16. And the case on which Defendants rely is wholly inapposite: *FTC v. Standard Oil* merely held that the respondent in an FTC administrative proceeding could not seek an order effectively enjoining that proceeding based solely on the ordinary costs of litigating it. 449 U.S. 232, 234–35 (1980). This ruling has no relevance to analyzing the effect of CFPB's closure on a direct services organization or city government services.

Finally, Defendants are wrong (at 25) about *HIAS v. Trump*, a case that unequivocally supports finding irreparable harm here. That court found irreparable harm

13

where agency action "requir[ed] diversion of resources away from the [plaintiffs'] core missions." 985 F.3d 309, 326 (4th Cir. 2021). So too, here. Defendants focus on the court's alternative finding that the plaintiffs' local affiliates, in some jurisdictions, would likely have to cease their work. But that is not dissimilar to the situation here, where some of Plaintiffs' programs would suffer significantly as a result of the government's action, even if Plaintiffs themselves did not cease to exist. *See* White Decl. ¶¶ 12–14; Leach Decl. ¶¶ 15–17. And *HIAS* hardly stands for the proposition that a threat to organizational mission must be existential to be irreparable: It notes that an erosion of community connections is likewise "significant and irreparable," 985 F.3d at 326, and the same would be true here.

### III.    The equities support injunctive relief.

The public interest weighs strongly in favor of ensuring that the CFPB is equipped to carry out its mission. *See* Br. at 14. In arguing otherwise, Defendants ignore the significant value the CFPB has returned to American consumers, *see id.*, and largely rehash (at 25) their merits arguments. They are incorrect. And the government has no valid interest in misapplying the law. *See Roe v. Dep't of Def.*, 947 F.3d 207, 230–31 (4th Cir. 2020).

Failing that, Defendants complain that injunctive relief would irreparably harm the government, because it could not "'effectuat[e the] statute[] enacted by representatives of its people'"—to wit, Dodd-Frank's requirement that Defendant Vought determine what funds are necessary to carry out the CFPB's authorities. Opp'n at 25 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). That, too, misapprehends the statute at hand. *See supra* at 9–10. And regardless, Defendants' protestations fall flat in light of their scant concern for "effectuating" other provisions of Dodd-Frank "enacted by representatives of [the] people," such as those creating the CFPB and directing it to perform

14

functions critical to the public interest. *See* 12 U.S.C. § 5493; *see also* Moore Decl. (noting temporary inaccessibility of statutorily required complaint line). There can be no "public interest in ensuring that federal funds are managed judiciously and efficiently," Opp'n at 26, where that really means unilaterally eliminating a congressionally mandated agency.

## IV.   The requested relief satisfies Rule 65.

Finally, Defendants feign confusion about the terms of the injunction Plaintiffs seek, arguing (at 26) that the proposed order is insufficiently specific or detailed under Rule 65(d)(2)(B)–(C). They conspicuously neglect, however, to provide any example where a court has found analogous language to fail that test, and, regardless, Rule 65(d) does not contemplate denying injunctive relief because a proposed order lacks adequate specificity or detail. There is no confusion here, as Plaintiffs clearly mean that Defendants cannot transfer money from the CFPB's unobligated funds outside of its control, other than to satisfy the ordinary operating obligations of the CFPB. In any event, because Plaintiffs' original proposed order related to their motion for a temporary restraining order, which has now been converted into one for preliminary injunction, Plaintiffs have attached a new proposed order granting the motion now before this Court.[13]

## CONCLUSION

The Court should enter a preliminary injunction prohibiting Defendants from transferring, relinquishing control or ownership of, or otherwise depleting CFPB's balance of unobligated funds, other than to satisfy the ordinary operating obligations of the CFPB.

---

[13] This new proposed order largely tracks language that Defendants themselves jointly proposed to this Court mere weeks ago, resolving any potential arguments about its clarity. Further, because Defendants do not claim a bond is needed and will incur no damages from being enjoined from unlawfully defunding the CFPB, the Court should waive the security requirement under Rule 65(c).

15

Dated: February 25, 2025                    Respectfully submitted,

/s/ *Mark B. Samburg*

Mark B. Samburg
Kevin E. Friedl*
Jessica Anne Morton*
Daniel McGrath*
J. Sterling Moore*
Robin F. Thurston*
Skye L. Perryman*
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
msamburg@democracyforward.org
kfriedl@democracyforward.org
jmorton@democracyforward.org
dmcgrath@democracyforward.org
smoore@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs*

*admitted *pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 25, 2025, I caused the foregoing and attached proposed order to be filed electronically through the Court's CM/ECF system, which provides notice to all counsel of record.


February 25, 2025                              /s/ *Mark B. Samburg*
                                               Mark B. Samburg