# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| **MAYOR AND CITY COUNCIL OF BALTIMORE**, *et al.*, | * | |
| | * | |
| **Plaintiffs**, | * | |
| | * | **Civ. No. MJM-25-458** |
| **v.** | * | |
| | * | |
| **CONSUMER FINANCIAL PROTECTION BUREAU**, *et al.*, | * | |
| | * | |
| **Defendants**. | * | |

\* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

Plaintiffs Mayor and City Council of Baltimore ("City of Baltimore") and Economic Action Maryland Fund ("Economic Action") (collectively, "Plaintiffs") commenced this civil action seeking preliminary and permanent injunctive relief against defendants Consumer Financial Protection Bureau ("CFPB" or "Bureau") and the Bureau's Acting Director Russell Vought (collectively, "Defendants") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*. ECF No. 1 (Complaint). Plaintiffs filed a motion for a temporary restraining order, ECF No. 8, that was converted to a motion for a preliminary injunction by stipulation of the parties, ECF No. 17. Defendants filed a response in opposition to the motion, ECF No. 29, and Plaintiffs filed a reply in support of it, ECF No. 30.[1] The Court conducted a hearing on the motion on

---

[1] The attorneys general for several states submitted an amicus brief in support of Plaintiffs' motion. ECF No. 28

February 26, 2025. Thereafter, the parties made supplemental filings in support of their respective positions. ECF Nos. 36, 39, 41, 43 & 44.

Plaintiffs' claims for judicial review under the APA are founded upon their allegation that Defendants made a discrete and final, yet unrealized, decision to defund the CFPB to the point where it cannot perform functions mandated by statute. But Plaintiffs fail to make a clear showing that any such decision was made and constitutes a final agency action subject to judicial review under the APA. Because Plaintiffs fail to demonstrate a likelihood of success on the merits of their claims, their motion for the extraordinary remedy of preliminary injunctive relief must be denied.

## I.    BACKGROUND

### A.  Purpose and Functions of the Consumer Financial Protection Bureau

The CFPB is a regulatory agency within the Federal Reserve System that was created by the Consumer Financial Protection Act of 2010 ("CFPA"). Pub. L. No. 111-203, 124 Stat. 1376. The CFPA centralizes within the Bureau responsibility for implementation and enforcement of federal consumer financial law "for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). The CFPB's "primary functions" are:

> (1) conducting financial education programs;
>
> (2) collecting, investigating, and responding to consumer complaints;
>
> (3) collecting, researching, monitoring, and publishing information relevant to the functioning of markets for consumer financial products and services to identify risks to consumers and the proper functioning of such markets;

(4) subject to sections 5514 through 5516 of this title, supervising covered persons[2] for compliance with Federal consumer financial law, and taking appropriate enforcement action to address violations of Federal consumer financial law;

(5) issuing rules, orders, and guidance implementing Federal consumer financial law; and

(6) performing such support activities as may be necessary or useful to facilitate the other functions of the Bureau.

*Id.* § 5511(c).

In furtherance of its primary functions, the CFPB is obligated by statute to engage in specified activities and provide particular services in the interest of protecting consumers in markets for financial products and services. The CFPA requires the CFPB Director to establish certain units within the Bureau, each with its own functions and responsibilities, to include "researching, analyzing, and reporting on" various aspects of the consumer financial marketplace, *id.* § 5493(b)(1); "providing information, guidance, and technical assistance regarding the offering and provision of consumer financial products or services to traditionally underserved consumers and communities[,]" *id.* § 5493(b)(2); and collecting and tracking consumer complaints through maintenance of a "toll-free telephone number, a website, and a database . . . to facilitate the centralized collection of, monitoring of, and response to consumer complaints . . . ," *id.* § 5493(b)(3)(A). In consultation with "appropriate Federal regulatory agencies," the Bureau "shall establish . . . reasonable procedures to provide a timely response to consumers" who submit complaints against, or inquiries about, individuals and entities offering and providing consumer financial products or services. *Id.* § 5534(a). "[T]o support its rulemaking and other functions, the Bureau shall monitor for risks to consumers in the offering or provision of consumer financial

---

[2]    "Covered persons" include individuals or entities engaged in offering or providing consumer financial products or services. 12 U.S.C. § 5481(6)(A).

products or services, including developments in markets for such products or services," *id.* § 5512(c)(1), and "shall publish" at least one report of "significant findings" of such monitoring each calendar year, *id.* § 5512(c)(3). In addition, "[t]he Director shall establish" an Office of Fair Lending and Equal Opportunity, an Office of Financial Education, an Office of Service Member Affairs, and an Office of Protection for Older Americans, each with its own powers and duties. *Id.* § 5493(c), (d), (e), (g).

The CFPB is also subject to mandates imposed by a broader set of consumer financial protection laws. For example, the Home Mortgage Disclosure Act requires mortgage lenders to collect and report information about applications for mortgage loans to the Bureau, *id.* § 2803, and the Bureau "shall provide staff and data processing resources" to the Federal Financial Institutions Examination Council to allow that body to compile, analyze, and publish the data, *id.* § 2809.

### B. Funding the CFPB

Unlike most federal agencies, the CFPB is funded "outside the ordinary annual appropriations process." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 422, 144 S. Ct. 1474, 1479, 218 L. Ed. 2d 455 (2024). The Bureau maintains two separate funds: the Bureau of Consumer Financial Protection Fund ("Bureau Fund") and the Consumer Financial Civil Penalty Fund ("Civil Penalty Fund"). ECF No. 29-1, ¶ 3 (Declaration of Ngagne Jafner Gueye); *see also* 12 U.S.C. § 5497(b)(1), (d)(1) (provisions for establishment and maintenance of Bureau Fund and Civil Penalty Fund, respectively). The Civil Penalty Fund is funded by civil penalties imposed and collected by the CFPB and is used to remedy harms to identified victims. 12 U.S.C. § 5497(d). It is not used in Bureau operations. Separately, the Bureau Fund is funded through transfers administered by the Board of Governors of the Federal Reserve System. *Id.* § 5497(a), (b)(2). This money is used for CFPB's operating expenses "in carrying out

its duties and responsibilities." *Id.* § 5497(c)(1). The Bureau may also request the Board of Governors "to direct the investment of the portion of the Bureau Fund that is not, in the judgment of the Bureau, required to meet the current needs of the Bureau." *Id.* § 5497(b)(3)(A).

The CFPA requires the Board of Governors to transfer on a yearly or quarterly basis an "amount determined by the Director to be reasonably necessary" for the Bureau to carry out its authorities under federal consumer financial law. *Id.* § 5497(a)(1). In determining the amount to request from the Board of Governors, the CFPB Director must "tak[e] into account such other sums made available to the Bureau from the preceding year (or quarter of such year)." *Id.* The amount that the CFPB may draw annually is subject to a statutory cap that, since 2013, has been set at 12% of the Federal Reserve System's 2009 operating expenses, adjusted annually for inflation. *Id.* § 5497(a)(2)(A)(iii), (B).

According to Plaintiffs, during fiscal year 2024, the statutory cap was $785.4 million, and the CFPB requested and received from the Board of Governors four transfers totaling $729.4 million. ECF No. 1, ¶ 22; *see also* CFPB, *Funds Transfer Requests*, https://www.consumerfinance.gov/about-us/budget-strategy/funds-transfer-requests/ (last visited Mar. 8, 2025). As of January 31, 2025, the sum of the accounts in the Bureau Fund showed a balance of $711,586,678.00, reflecting both obligated and unobligated funds. ECF No. 29-1, ¶ 4.

### C.  Recent Actions by the CFPB and its Acting Director

On February 7, 2025, President Donald J. Trump appointed Russell Vought to serve as Acting Director of the CFPB.[3] ECF No. 29-1, ¶ 7.

---

[3]    Mr. Vought also serves as Director of the Office of Management and Budget ("OMB") within the Executive Office of the President. On February 11, 2025, the President nominated Jonathan McKernan to serve as Director of the CFPB. As of the date of this Memorandum, Mr. McKernan's nomination is pending before the U.S. Senate.

Shortly after this appointment, Mr. Vought reviewed a spreadsheet showing that the Bureau Fund had a balance of $412,346,065.32 in unobligated funds. *Id.* ¶ 8, Ex. A (spreadsheet). Of these unobligated funds, $220,000,000.00 was internally earmarked for an operating reserve ("Reserve Fund"). *Id.* The remaining $192,346,065.32 represented the CFPB's operating balance. *Id.* Mr. Vought determined that the funds currently available to the Bureau were sufficient to carry out its statutory mandate for the next fiscal quarter and that no additional funds were necessary for this purpose. *Id.* ¶ 9, Ex. B (letter from Mr. Vought to Jerome Powell dated February 8, 2025 ("Vought Letter")). The factors Mr. Vought considered in making this determination included the current balance of the Bureau Fund, the CFPB's projected expenses for the next quarter, the President's goals of increasing government efficiency, "the public's interest in a streamlined and efficient bureau, the impact of government spending on the federal deficit, the impact of anticipated efficiency initiatives at the Bureau, and the consumer interest." *Id.* ¶¶ 9–10.

On behalf of the Bureau, Mr. Vought sent Jerome Powell, Chair of the Federal Reserve Board of Governors, a letter dated February 8, 2025, requesting zero dollars for the third quarter of fiscal year 2025. *Id.* ¶ 11, Ex. B. In letter, Mr. Vought stated, in part:

> I have determined that no additional funds are necessary to carry out the authorities of the Bureau for Fiscal Year 2025. The Bureau's current funds are more than sufficient—and are, in fact, excessive—to carry out its authorities in a manner that is consistent with the public interest.
>
> In the past, the Bureau has at times opted to maintain a "reserve fund" for financial contingencies. But no such fund is required by statute or necessary to fulfill the Bureau's mandate. The Bureau's new leadership will run a substantially more streamlined and efficient bureau, cut this excessive fund, and do its part to reduce the federal deficit.

*Id.*, Ex. B.[4]

On the same date as his letter to Mr. Powell, Mr. Vought sent an "all-hands" email to CFPB employees instructing them not to perform certain rulemaking, investigative, litigation, public relations, contracting, and monitoring functions. *National Treasury Employees Union, et al. v. Vought, et al.* ("*NTEU*"), No. 1:25-cv-00381-ABJ,[5] ECF No. 23-2 (email dated Feb. 8, 2025, with subject line: "Directives on Bureau Activities"). The next day, the CFPB's Chief Operating Officer, Adam Martinez, sent another email to CFPB employees announcing that the Bureau's headquarters in Washington, D.C. would be closed from February 10 through February 14. *Id.* at ECF No. 23-3 (email dated Feb. 9, 2025, with subject line: "Please Read: DC Headquarters Building Operating Status (2/10-2/14)"). According to Mr. Martinez, the headquarters was closed due to safety and security concerns arising from protests outside the building. *Id.* at ECF No. 31-1, ¶¶ 12–17 (Declaration of Adam Martinez). On February 10, Mr. Martinez sent another email to Bureau employees directing them not to "perform any work tasks." *Id.* at ECF No. 23-4 (email

---

[4]     The Vought Letter is not the first time a CFPB head has requested zero dollars from the Board of Governors. In a letter dated January 17, 2018, then-Acting Director Mick Mulvaney requested zero dollars for the second quarter of fiscal year 2018. ECF No. 29-2 ("Mulvaney Letter"). Mr. Mulvaney noted that the Bureau Fund had a balance of $177.1 million at the beginning of fiscal year 2018 and that amount remained available to the Bureau. *Id.* With expenses for the second quarter projected to approximate $145 million, Mr. Mulvaney determined that "no additional funds [were] necessary" for the Bureau "to carry out its statutory mandates" for the second quarter "while striving to be efficient, effective, and accountable." *Id.* Finally, Mr. Mulvaney stated his "intent to spend down" the Bureau's "reserve fund," noting that he "s[aw] no practical reason for such a large reserve," considering that "the Board has never denied a Bureau request for funding and has always delivered requested funds in a timely fashion." *Id.*

[5]     In *NTEU*, a diverse set of organizational plaintiffs and one individual plaintiff brought suit against Defendants seeking injunctive relief to prevent the shutdown of the CFPB and to require the Bureau to continue operating and carrying out its statutorily mandated functions. *See NTEU*, at ECF No. 7 (Amended Complaint). The parties in *NTEU* consented to a temporary order directing Defendants not to "transfer, relinquish, or return any money from the CFPB's reserve funds." *Id.*, at ECF No. 19. Defendants are also temporarily restrained from "delet[ing], destroy[ing], remov[ing], or impair[ing] any data, database or other CFPB records; terminat[ing] any CFPB employee, except for cause related to the specific employee's performance or conduct; [and] issu[ing] any notice of reduction-in-force to any CFPB employee." *Id.* This Order will remain in effect until a ruling on the plaintiffs' preliminary injunction motion is entered. *Id.* As of the date of this Memorandum, the preliminary injunction motion in *NTEU* remains pending.

dated Feb. 10, 2025, with subject line: "Additional Directives on Bureau Activities"). That week, the Bureau terminated certain probationary-period employees, trial-period attorneys, and employees serving limited terms.

On February 11, 2025, the President issued an Executive Order titled *Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative*, Exec. Order No. 14,210, 90 Fed. Reg. 9669 (Feb. 11, 2025) ("Workforce Optimization"). This Executive Order was prescribed to "commence[ ] a critical transformation of the Federal bureaucracy" and directed the heads of federal agencies within the Executive Branch "promptly" to prepare "large-scale reductions in force (RIFs), consistent with applicable law." *Id.*

On the same date as the Executive Order on Workforce Optimization, Mr. Martinez sent an email to two other CFPB officials stating that the Bureau's Chief Financial Officer, Ngagne Jafner Gueye, was "currently in communications with the Federal Reserve regarding the Bureau's ability to return money to either Treasury or the Federal Reserve if needed." ECF No. 41-2 (email dated Feb. 11, 2025, with subject line: "CPF and Funding Transfer"). Mr. Martinez explained in a supplemental declaration filed in *NTEU* that Mr. Gueye had "receive[d] an inquiry about whether 'excess' funds from the Bureau Fund could be transferred back to the Federal Reserve." ECF No. 39-2, ¶ 6 (Supplemental Declaration of Adam Martinez). Mr. Gueye "shared that . . . he would conduct research, including communicating with the Federal Reserve to determine if there was any authority or mechanism" to transfer funds back to the Federal Reserve. *Id.* According to Mr. Martinez and Mr. Gueye, the CFPB has made no attempts to transfer any of its funds to the Federal Reserve, and both officials are unaware of any mechanism to do so. *Id.*; ECF No. 29-1, ¶ 16.

On February 26, 2025, Mr. Vought, in his capacity as OMB Director, and the Acting Director of the Office of Personnel Management issued a memorandum to the heads of all federal

executive departments and agencies to provide guidance on implementation of the Executive Order on Workforce Optimization. OMB and Off. Pers. Mgmt., Memorandum Re: Guidance on Agency RIF and Reorganization Plains Requested by *Implementing The President's "Department of Government Efficiency" Workforce Optimization Initiative* (Feb. 26, 2025) https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-agency-rif-and-reorganization-plans-requested-by-implementing-the-president-s-department-of-government-efficiency-workforce-optimization-initiative.pdf ("OMB/OPM Memo"). The memorandum directs federal agencies to "focus on the maximum elimination of functions that are not statutorily mandated while driving the highest-quality, most efficient delivery of their statutorily-required functions." *Id.* at 2. It states further that "[a]gencies should review their statutory authority and ensure that their plans and actions are consistent with such authority." *Id.*

Mr. Martinez and Mr. Gueye each aver that "[t]he Bureau is committed to performing its statutory obligations, including those listed in 12 U.S.C. § 5493(b)(3)(A)[.]" ECF No. 29-1, ¶ 18; *NTEU*, at ECF No. 31-1, ¶ 22. The closure of the CFPB's headquarters has not stopped the Bureau from performing certain statutorily required functions. *NTEU*, at ECF No. 31-1, ¶ 20. Specifically, the Bureau "is maintaining a single, toll-free telephone number, a website, and a consumer complaint database[.]"[6] ECF No. 29-1, ¶ 19; *NTEU*, at ECF No. 31-1, ¶ 22. Additionally, as required by the Home Mortgage Disclosure Act, the Bureau is providing staff and resources to

---

[6]    Although Plaintiffs attach to their motion the declaration of one of their attorneys describing his difficulty starting the process of submitting a consumer complaint by phone on February 12, 2025, ECF No. 8-4 (Declaration of J. Sterling Moore), Plaintiffs state in their reply brief that they "do not dispute that the CFPB *presently* provides" the consumer complaint database, website, and phone number required by statute. ECF No. 30 at 9 n.9. The Court notes, however, that CFPB's Chief of Staff for the Office of Consumer Response, Matthew Pfaff, states in a declaration submitted in *NTEU* and in a supplemental filing here that the Bureau's "complaint handling operation has experienced a significant disruption" and certain types of complaints are not being reviewed, addressed, monitored, or investigated. ECF No. 36-2, ¶¶ 11–18 (Declaration of Matthew Pfaff).

enable the Federal Financial Institutions Examination Council to compile and publish information about applications for mortgage loans that is reported to the Bureau by mortgage lenders. ECF No. 29-1, ¶ 20 (citing 12 U.S.C. § 2809(a)); *NTEU*, at ECF No. 31-1, ¶ 23. Further, Bureau leadership has approved various requests for exceptions to its directive to stop work, which has allowed the Bureau to continue carrying out its statutory functions, including those listed in 12 U.S.C. § 5493(b)(3)(A), security monitoring tasks, maintenance tasks, processing payments to consumers, and processing consumer complaints. *NTEU*, at ECF No. 31-1, ¶¶ 19–23; *see also id.* at ECF No. 56-1 at 55–56.

The CFPB's efforts to determine "the proper amount by which to reduce [its] Reserve Fund" are ongoing. ECF No. 29-1, ¶ 14. A reduction in the Reserve Fund would make that money available to the Bureau to use for its operations and reduce the need for any transfer of funds from the Federal Reserve. *Id.* ¶ 15. Before the Bureau's "recent efficiency initiatives under Acting Director Vought," its projected expenses were $132,100,000.00 for the third quarter of fiscal year 2025 and $132,000,000.00 for the fourth quarter. *Id.* ¶ 17. The Bureau's "ongoing efforts to increase efficiency and reduce waste" are expected to reduce these projections. *Id.*

### D. Plaintiffs' Complaint and Motion for Preliminary Injunctive Relief

On February 12, 2025, plaintiffs City of Baltimore and Economic Action filed a Complaint for Injunctive and Declaratory Relief against the CFPB and its Acting Director. ECF No. 1. The Complaint alleges violations of the APA in two counts, challenging the Acting Director's request of zero dollars from the Board of Governors, combined with an alleged decision and attempt to return CFPB's existing operating and reserve funds to the Federal Reserve. *Id.* On the same date they filed the Complaint, Plaintiffs filed a Motion for a Temporary Restraining Order ("TRO") pursuant to Rule 65 of the Federal Rules of Civil Procedure, ECF No. 8, seeking a court order

temporarily restricting Defendants from "taking any steps to defund" the Bureau, "including by transferring the Bureau's reserve funds or otherwise using them for a purpose other than the operation of the Bureau[,]" ECF No. 8-5.

Plaintiffs' central claim in this litigation is that Defendants have decided and attempted to defund the CFPB and deprive it of its operating and reserve funds, making it incapable of performing its statutorily mandated functions and continuing its other work. ECF No. 1, ¶¶ 40–42; ECF No. 8-1 at 6–7. As evidence that the CFPB's leadership has decided to defund the Bureau to a non-operational level, Plaintiffs cite the Bureau's request for zero dollars from the Federal Reserve for the third quarter of the fiscal year; its research into whether the Bureau's funds could be transferred back to the Federal Reserve; its closure Bureau headquarters from February 10 through February 14; and its directive to CFPB employees to stop working. *Id.* at 5–7. Further, Plaintiffs cite statements in the media by Mr. Vought, President Trump, and others about the Bureau. Plaintiffs also point out that, in 2023, Mr. Vought played a role in devising the Heritage Foundation's *Project 2025: Presidential Transition Project* ("*Project 2025*"), which calls for the CFPB to be abolished. ECF No. 1, ¶ 28; ECF No. 8-1 at 5. Plaintiffs contend that they will be harmed if the CFPB fails to maintain the funding necessary for it to comply with its statutory mandate and continue its other work on behalf of American consumers.

The City of Baltimore is a municipal corporation organized pursuant to Articles XI and XI-A of the Maryland Constitution. ECF No. 8-3, ¶ 4 (Declaration of Faith Leach). Baltimore is the largest city in Maryland, with a population of nearly 600,000 people, nearly 60% of which are Black. *Id.* ¶¶ 5, 6. The Baltimore City Law Department bears responsibility for protecting Baltimoreans from predatory business practices, including misleading practices, unfair and deceptive practices, and discrimination in lending. *Id.* ¶ 7. In light of Baltimore's extensive history

of redlining and racial segregation, Baltimore takes its role in enforcing consumer protections very seriously. *Id.* ¶¶ 8–10. Baltimore's consumer protection laws give the Law Department the power to take action against companies who harm Baltimore citizens through their trade practices. *Id.* ¶ 11. The CFPB's oversight of federal consumer protection laws complements Baltimore's efforts to protect its residents. *Id.* ¶ 17. Given its limited resources, Baltimore relies on the CFPB's consumer complaint database to "identify and prioritize affirmative consumer-protection actions to protect Baltimoreans." *Id.* ¶¶ 12–15. Without access to the CFPB's consumer complaint database, Baltimore City officials would be less efficient in their efforts to identify and prioritize affirmative consumer-protection actions because they would be forced to conduct additional research, which would be less effective than that done by the CFPB. *Id.* ¶ 15. As a result, Baltimore enforcement actions would be less effective, and more resource intensive. *Id.* Baltimore City staff have also attended trainings put on by CFPB, and without those trainings, Baltimore will have to reallocate resources to collect the information itself or identify another source. *Id.* ¶ 16. Without the CFPB, Baltimore residents would be at greater risk of being "tricked and trapped by shady financial practices," and Baltimore would be deprived of important information about predatory practices and consumer protection efforts that it has used to serve its citizens. *Id.* Baltimore would be "forced to divert resources from other essential functions just to provide the same level of protection that residents enjoy now." *Id.*

Economic Action is a "statewide nonprofit movement of individuals and organizations that advances economic inclusion and financial justice through research, advocacy, consumer education, and direct service." ECF No. 8-2, ¶ 2 (Declaration of Marceline White). Economic Action provides direct assistance to individuals in need, including supporting Maryland households struggling with housing, economic security, medical debt, and other issues, and

advocates for policy change. *Id.* ¶ 3. Economic Action has used CFPB education materials and has found that submitting complaints to the CFPB is an important tool in helping people address various financial problems. *Id.* ¶¶ 4–7. Economic Action's mission would become more difficult without the CFPB's consumer complaint database; its counselors would need to devote more time to reach the same result. *Id.* ¶ 8. Economic Action has found the CFPB's publication of consumer complaints to be an important and useful resource, allowing it to better understand emerging problems that are particularly relevant for Maryland consumers. *Id.* ¶ 9. Additionally, Economic Action relies on information and data about mortgage loans collected and published by the CFPB under the Home Mortgage Disclosure Act to help borrowers and to advocate for fairer housing policies. *Id.* ¶¶ 10–12. Without the CFPB, Economic Action would have to either cut back on its direct services or divert resources from other parts of its mission. *Id.* ¶¶ 13–14.

On February 13, 2025, the parties filed a joint motion stipulating to converting Plaintiffs' motion for a TRO to one for a preliminary injunction, a briefing schedule for the motion, and temporary restrictions against Defendants transferring the Bureau's reserve funds until February 28, 2025. ECF No. 17. Plaintiffs now seek a preliminary injunction against Defendants transferring money from the CFPB's balance of unobligated funds, relinquishing control or ownership of these funds, and "taking any steps to reduce the amount of money available to the CFPB below the amount available as of February 13, 2025, other than to satisfy the Bureau's ordinary operating obligations . . . ." ECF No. 31. Defendants filed a response in opposition to Plaintiffs' motion on February 20, 2025, arguing, *inter alia*, that Plaintiffs' claims are not ripe and not based on upon a discrete and final agency action. ECF No. 29. Plaintiffs filed a reply in support of their motion on February 25, 2025. ECF No. 30.

The Court conducted a hearing on the motion on February 26, 2025. Two days later, Plaintiffs made a supplemental filing to attach declarations that had been recently filed in *NTEU*. ECF No. 36. Upon receipt and review of this supplemental material, the Court provided a deadline for Defendants to respond and ordered that the stipulated restraining order be extended to March 14, 2025. ECF No. 38. Thereafter, Plaintiffs sought leave to file the Supplemental Declaration of Adam Martinez, ECF No. 39, and Mr. Martinez's February 11, 2025, email as a supplemental exhibit, ECF No. 41, which the Court granted, ECF Nos. 40 & 42. Defendants filed a response to Plaintiffs' supplemental filings on March 6, 2025, ECF No. 43, and Plaintiffs filed a motion seeking leave to file a supplemental reply, which attached a proposed reply brief. ECF No. 44.

## II.    APPLICABLE LAW

### A.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008). Preliminary injunctive relief "involv[es] the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002) (quoting *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)). Awarding this extraordinary remedy thus requires "a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 129 S. Ct. at 376. To prevail on a motion for a preliminary injunction, a plaintiff must demonstrate (1) that it is likely to succeed on the merits of its claims, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that an injunction is in the public interest. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023) (citing *Winter*, 555 U.S. at 20, 129 S. Ct. at 374). The third and

fourth *Winter* factors are assessed "in tandem when the government . . . is the opposing party." *Id.* at 368 (citing *Winter*, 555 U.S. at 26, 129 S. Ct. at 378).

A court may "deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors." *Id.* at 361. At this stage, likelihood of success on the merits is the "most important" factor. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 949 (D. Md. 2020), *order dissolved sub nom. Casa de Maryland, Inc. v. Mayorkas*, Civ. No. PX-20-2118, 2023 WL 3547497 (D. Md. May 18, 2023) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). Although a "certainty of success" is not required to justify a preliminary injunction, a plaintiff seeking such extraordinary relief before trial "must make a clear showing that [it] is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted); *accord Dewhurst v. Century Aluminum Co.,* 649 F.3d 287, 290 (4th Cir. 2011); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *judgment vacated on other grounds*, 559 U.S. 1089, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010).

**B.  Ripeness Doctrine**

Article III of the U.S. Constitution vests federal courts "with the 'Power' to resolve not questions and issues but 'Cases' or 'Controversies.'" *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 132, 131 S. Ct. 1436, 1441, 179 L. Ed. 2d 523 (2011). The role and jurisdiction of a federal court is limited to "redress[ing] or prevent[ing] actual or imminently threatened injury to persons caused by private or official violation of law." *B.R. v. F.C.S.B.*, 17 F.4th 485, 492–93 (4th Cir. 2021) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492, 129 S. Ct. 1142, 1148, 173 L.Ed.2d 1 (2009)). "Except when necessary in the execution of that function, courts have no charter to review and revise legislative and executive action." *Summers*, 555 U.S. at 492, 129 S. Ct. at 1148. This restriction on the court's jurisdiction "is founded in concern about the proper—and

properly limited—role of the courts in a democratic society." *Id.* at 492–93, 129 S. Ct. at 1148 (quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205, 45 L. Ed. 2d 343 (1975)).

The question of whether a dispute is ripe for judicial consideration "presents a 'threshold question of justiciability'" that is rooted in Article III's "case or controversy" requirement. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269–70 (4th Cir. 2013) (quoting *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 195 (4th Cir. 2013)) (internal brackets omitted). The ripeness doctrine "prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." *Id.* at 270 (quoting *Miller v. Brown,* 462 F.3d 312, 318–19 (4th Cir. 2006)). A case is not ripe "if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative.'" *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (quoting *Gasner v. Bd. of Supervisors*, 103 F.3d 351, 361 (4th Cir. 1996)). "To be sure, ripeness can rest on anticipated future injury[,]" but "the future injury cannot . . . 'rest[ ] upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Wild Virginia v. Council on Env't Quality*, 56 F.4th 281, 295 (4th Cir. 2022) (quoting *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)).

"In the administrative context," the ripeness doctrine "'prevent[s] the courts . . . from entangling themselves in abstract disagreements over administrative policies, and . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Standage v. Braithwaite*, 526 F. Supp. 3d 56, 92 (D. Md. 2021) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732–33, 118 S. Ct. 1665, 1670, 140 L. Ed. 2d 921 (1998)); *accord White v. United States Env't Prot. Agency*, 737 F. Supp. 3d 310, 321 (E.D.N.C. 2024). *See also Reno v. Cath. Soc. Servs., Inc.*, 509

16

U.S. 43, 57, 113 S. Ct. 2485, 2495, 125 L. Ed. 2d 38 (1993) (stating that courts traditionally avoid applying injunctive and declaratory remedies to administrative decisions "'unless these arise in the context of a controversy 'ripe' for judicial resolution,' . . . that is to say, unless the effects of the administrative action challenged have been 'felt in a concrete way by the challenging parties'") (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S. Ct. 1507, 1515, 18 L. Ed. 2d 681 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S. Ct. 980, 984, 51 L. Ed. 2d 192 (1977)) (footnote omitted).

Determining whether a matter is ripe involves "balanc[ing] the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration." *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002) (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733, 118 S. Ct. at 1670) (internal quotation marks omitted). "A case is fit for judicial decision where the issues to be considered are purely legal ones and where the agency rule or action giving rise to the controversy is final and not dependent upon future uncertainties or intervening agency rulings." *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208–09 (4th Cir. 1992), *as amended* (Nov. 2, 1992) (citing *Abbott Labs.*, 387 U.S. at 149, 87 S. Ct. at 1515). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiffs] who would be compelled to act under threat of enforcement of the challenged law." *Miller*, 462 F.3d at 319 (quoting *Charter Fed. Sav. Bank*, 976 F.2d at 208–09). "An agency action causes hardship when it 'create[s] adverse effects of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm.'" *White*, 737 F. Supp. 3d at 321–22 (quoting *Ohio Forestry Ass'n*, 523 U.S. at 733, 118 S. Ct. at 1670).

### C. Administrative Procedure Act

While finality in a challenged agency action is required for the challenge to be ripe for adjudication, such finality is also required to qualify for judicial review under the Administrative Procedure Act. *See* 5 U.S.C. § 702 (conferring right of review against federal agency or officer thereof); *Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Def.*, 990 F.3d 834, 839 (4th Cir. 2021) (recognizing the scope of the APA's waiver of sovereign immunity to be limited to "judicial review of only '*final* agency action[s]'") (quoting 5 U.S.C. § 704) (emphasis added). The APA permits judicial review a "final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704. A person legally wronged, adversely affected, or aggrieved by "agency action," 5 U.S.C. § 702, may contest the action "on the ground that the agency has neglected to follow the statutory directives of Congress[,]" *Webster v. Doe*, 486 U.S. 592, 599, 108 S. Ct. 2047, 2051, 100 L. Ed. 2d 632 (1988). The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act . . . ." 5 U.S.C. § 551(13). "[T]his provision refers only to conduct that is 'circumscribed' and 'discrete.'" *Nat'l Veterans Legal Servs.*, 990 F.3d at 839 (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62, 124 S. Ct. 2373, 2378, 159 L. Ed. 2d 137 (2004)).[7] Importantly, the "agency action" must be "*final*" to qualify for judicial review under the APA. *Id.* at 840.

---

[7]    "[L]imiting judicial review to *discrete* agency action 'precludes . . . broad programmatic attack[s],' . . . and helps ensure that courts are not injected 'into day-to-day agency management[.]'" *Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 194 (4th Cir. 2013) (quoting *Norton*, 542 U.S. at 64, 67, 124 S. Ct. at 2379–80).

> This distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers. Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. We are woefully ill-suited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction, *see Int'l Longshoremen's Ass'n, Local 1291 v. Phil. Mar.*

Two conditions must be met for an agency action to be deemed "final" for purposes of the APA. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597, 136 S. Ct. 1807, 1813, 195 L. Ed. 2d 77 (2016); *Bennett v. Spear*, 520 U.S. 154, 177, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process[;] it must not be of a merely tentative or interlocutory nature." *Bennett*, 520 U.S. at 177–78, 117 S. Ct. at 1168 (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113, 68 S. Ct. 431, 437, 92 L. Ed. 568 (1948)). Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Id.* at 178, 117 S. Ct. at 1168 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S. Ct. 203, 209, 27 L. Ed. 2d 203 (1970)). "To satisfy *Bennett*'s second prong, an agency action must cause 'direct and appreciable legal consequences.'" *Racing Enthusiasts & Suppliers Coal. v. EPA*, 45 F.4th 353, 358 (D.C. Cir. 2022) (quoting *Hawkes*, 578 U.S. at 598, 136 S. Ct. at 1814). The U.S. Court of Appeals for the District of Columbia Circuit has explained that the court must conduct a "'pragmatic' inquiry . . . examin[ing] the 'concrete consequences' of an agency action" to determine whether *Bennett*'s second prong is met. *Id.* (quoting *Sierra Club v. E.P.A.*, 955 F.3d 56, 63 (D.C. Cir. 2020). "[A]n agency action does not have sufficient concrete consequences when it imposes 'no obligations, prohibitions, or restrictions' on a regulated party." *Id.* (quoting *Sierra Club*, 955 F.3d at 63). A "final agency action" reviewable under the APA "does not include . . . , for example constructing a building,

---

       *Trade Ass'n*, 389 U.S. 64, 76, 88 S. Ct. 201, 208, 19 L. Ed. 2d 236 (1967), or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so.

*City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).

operating a program, or performing a contract . . . ." *Nat'l Veterans Legal Servs.*, 990 F.3d at 839 (quoting *Vill. of Bald Head Island*, 714 F.3d at 193).

The APA "authorizes a court to set aside agency action that is 'arbitrary, capricious [or] an abuse of discretion.'" *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036 (D.C. Cir. 2012) (quoting 5 U.S.C. § 706(2)(A)). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S. Ct. 1150, 1158, 209 L. Ed. 2d 287 (2021). This standard is "deferential," *id.*, and calls for a "narrow" scope of review, forbidding the court from "substitut[ing] its judgment for that of the agency[,]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 2866, 77 L. Ed. 2d 443 (1983). The court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Prometheus Radio Project*, 592 U.S. at 423, 141 S. Ct. at 1158; *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 30–31, 103 S. Ct. at 2860–61 ("[The] court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment") (cleaned up). "The APA imposes no general obligation on agencies to produce empirical evidence[,]" but "an agency has to justify its rule with a reasoned explanation." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009). The court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43, 103 S. Ct. at 2867 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 1577, 91 L. Ed. 1995 (1947)). But even an agency decision of "less than ideal clarity" must be upheld "if the agency's path may reasonably be discerned." *Id.* (citation omitted).

20

## III.    DISCUSSION

Plaintiffs assert claims for judicial review under the APA in two counts. ECF No. 1. In Count One of their Complaint, Plaintiffs allege that a combination of Defendants' request for zero dollars from the Board of Governors and their alleged decision to discharge their existing Reserve Fund from Bureau control constituted a final agency action. *Id.* ¶ 60. Plaintiffs argue for preliminary injunctive relief on this basis in their opening brief in support of their motion. *See* ECF No. 8-1 at 6, 8, 10 ("Defendants' gambit of drawing $0 in funding while at the same time eliminating the agency's existing reserves is not in accordance with law . . . ."). They appear to recede from this position in their reply brief, now characterizing the zero-dollar request made in the Vought Letter dated February 8, 2025, as mere "*evidence* of the final agency action [they] challenge, not the action itself." ECF No. 30 at 4. For purposes of their motion, Plaintiffs now focus solely on the claim asserted in Count Two of their Complaint, that Defendants' alleged decision and attempt to defund the CFPB was an unlawful final agency action. *See* ECF No. 1, ¶ 66; ECF No. 30 at 4–8. In sum, Plaintiffs contend that Defendants have made a discrete and final decision and attempt to defund the CFPB to the point where it cannot fulfill its statutory mandate.

For reasons explained herein, the Court finds that Plaintiffs fall short of making a clear showing that they are likely to prevail on the merits of their claims against Defendants under the APA. In short, Plaintiffs fail to show that Defendants have made or acted upon a decision to transfer away the funds presently available to it to fulfill the CFPB's statutory mandate. What evidence Plaintiffs offer does not amount to a "clear showing" under *Winter v. Natural Resources Defense Council*, as required to justify the "extraordinary remedy" of a preliminary injunction. 555 U.S. at 22, 129 S. Ct. at 376,

**A.  No Showing of Any Final Decision to Transfer Operating or Reserve Funds**

Any final decision or attempt by Defendants to transfer away operating funds and reserves the CFPB needs to meet projected expenses could well be "arbitrary, capricious [or] an abuse of discretion" in violation of the APA. 5 U.S.C. § 706(2)(A). As Defendants acknowledge, the Bureau is under a statutory mandate to perform certain functions in the interests of American consumers in markets for financial products and services. The Bureau's mandate includes gathering, analyzing, and reporting on various aspects of consumer financial markets; providing information and guidance to underserved consumers and communities; collecting, tracking, and reporting consumer complaints; and monitoring risks in the marketplace and reporting findings. *See* Part I.A *supra* (citing 12 U.S.C. §§ 2803, 2809, 5493(b), 5512(c), 5534(a)). Plaintiffs have come to rely upon these services in furtherance of their efforts to protect Maryland consumers from unfair trade practices from large banks, provide counsel and advocacy to underserved Maryland consumers, and seek redress for victims. *See* ECF Nos. 8-2 & 8-3. If the CFPB were to transfer away the operating funds and reserves in its Bureau Fund and leave itself unable fulfill its statutory obligations, Plaintiffs' valuable efforts would be rendered less efficient and less effective, and they would be forced to reallocate limited resources. *See id.* But even assuming that a decision and effort by Defendants to completely defund the CFPB would be a final agency action sufficient to support a ripe claim to judicial review under the APA, the record before the Court set forth an adequate showing that any such decision or effort has been made. Without a final agency action to review, Plaintiffs' claims are not ripe, and they cannot obtain judicial review under the APA.

As explained in Part II.C *supra*, a final agency action is one that "mark[s] the 'consummation' of the agency's decisionmaking process" and determines "rights or obligations[,]" *Bennett*, 520 U.S. at 177–78, 117 S. Ct. at 1168, with "direct and appreciable legal

consequences[,]" *Hawkes*, 578 U.S. at 598, 136 S. Ct. at 1814. Here, Plaintiffs fail to make any showing of such a final agency decision. Instead, they challenge a disembodied and unrealized decision to drain the CFPB of its operating funds and reserves, without any evidence that such a decision has been reached at all or generated any legal consequences. The Court does not mean to suggest that a "final agency action" must be memorialized in writing in order to be reviewable under the ADA. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184–85 (D.D.C. 2015) ("Agency action . . . need not be in writing to be final and judicially reviewable.") (citation omitted). But there must be some discrete, final, and effective agency decision for a court to review in order for an aggrieved plaintiff to prevail in an action brought under the APA. The evidence before this Court does not amount to the clear showing of any such final agency decision.[8]

Plaintiffs have identified no statement by Mr. Vought or anyone else at the CFPB that they have decided or sought to transfer away the Bureau's reserves or use any money in the Bureau Fund for a purpose not authorized by statute. To the contrary, sworn declarations provided by two CFPB officials specifically state the Bureau's "commit[ment] to performing its statutory obligations." ECF No. 29-1, ¶ 18; *NTEU*, at ECF No. 31-1, ¶¶ 19–23. Both officials confirm that the Bureau continues to perform its consumer complaint collection and monitoring functions and fulfill specific requirements imposed by the Home Mortgage Disclosure Act. ECF No. 29-1, ¶ 16;

---

[8]    This case is readily distinguishable from those relied upon by Plaintiffs. In *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, 530 F.3d 925 (D.C. Cir. 2008), the agency conceded that the unwritten policy existed. In *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 175-75 (D.D.C. 2015), the court was presented with clear evidence of the challenged policy in the form of experts' and attorneys' firsthand knowledge, as well as an admission by the agency that officials are required to follow a specific policy. In *Florida v. United States*, No. 3:21CV1066-TKW-EMT, 2022 WL 2431414, at *10 (N.D. Fla. May 4, 2022), the court found, on a motion to dismiss, that the plaintiff *plausibly alleged* the existence of a policy—a claim supported by "hundreds of thousands" of affected individuals, which the court found to be "highly improbable (if not statistically impossible)" without a policy directive. Here, Defendants have made no admission of having rendered a final decision to defund the CFPB to a non-operational level, and there are no concrete consequences of any such decision nor any firsthand account of such a decision having been made.

*NTEU*, at ECF No. 31-1, ¶¶ 19–23. Further, they explain that the CFPB is engaged in "ongoing efforts to increase efficiency and reduce waste," ECF No. 29-1, ¶ 17; *NTEU*, at ECF No. 31-1, ¶ 25, which belies any notion that Defendants intend to transfer away funds the Bureau needs to operate as required by law. Moreover, both officials attest that the Bureau has made no attempt to transfer its funds out of its possession or control. *Id.* ¶ 6; ECF No. 29-1, at ¶ 16.

In a supplemental filing, Plaintiffs cite the fact that Mr. Gueye recently researched whether it was possible for the Bureau to transfer funds back to the Federal Reserve. ECF No. 41-1; *see also* ECF No. 41-2. Mr. Gueye ultimately determined that it was not possible, and Mr. Martinez avers that there is "no authority or mechanism" for the Bureau to transfer funds "to the control of any other entity[,]" ECF No. 39-2, at ¶ 6. The research conducted by Mr. Gueye does not amount to an attempt to transfer any of the Bureau's funds or reflect a final decision to take such action. Assuming this research was prompted by an interest in the possibility of transferring some portion of the funds presently in the Bureau's control, it does not establish a *final* decision to transfer any funds—much less, such a large transfer as to foreclose the agency from satisfying its statutory obligations.

Ultimately, Plaintiffs offer little more than speculation and conjecture that Defendants have made a final decision to transfer away the funds the CFPB needs to fulfill its statutory mandate. Based on the preliminary record, the Court cannot find Plaintiffs likely to succeed on the merits of its APA claims.

### B.  The Vought Letter

Plaintiffs cite the Vought Letter of February 8, 2025, as evidence of a decision and effort by Mr. Vought to fully defund the CFPB. ECF No 8-1 at 5–8, 8–10; ECF No. 30 at 1–7. In this letter, Mr. Vought requested zero dollars from the Federal Reserve Board of Governors for the

third quarter of fiscal year 2025. ECF No. 29-1, Ex. B. But the letter does not state any intention by Mr. Vought to defund the CFPB to a non-operational level. To the contrary, the Vought Letter states that the CFPB has a balance of $711,586,678.00 in its Bureau Fund and that "no additional funds are necessary to carry out the authorities of the Bureau for Fiscal Year 2025." *Id.* The letter expressly recognizes the CFPB's statutory mandate and states Mr. Vought's determination as Acting Director that the funds currently available for the Bureau's operations are sufficient for it to satisfy its mandate for third quarter and the remainder of the fiscal year.[9] Administrative agencies are entitled to a presumption "that they will act properly and according to law." *F.C.C. v. Schreiber*, 381 U.S. 279, 296, 85 S. Ct. 1459, 1470, 14 L. Ed. 2d 383 (1965); *see also Blinder, Robinson & Co. v. U.S. S.E.C.*, 748 F.2d 1415, 1418 (10th Cir. 1984) ("It is presumed that administrative agencies . . . will act within the law."). The Vought Letter supports a presumption that Defendants intend to act in accordance with the Bureau's statutory mandate, and Plaintiffs offer no reason or evidence to rebut this presumption.

---

[9]     Plaintiffs disclaim any contention that Defendants' zero-dollar request in the Vought Letter is itself an arbitrary and capricious agency action violative of the APA. ECF No. 30 at 4. Assuming that the Vought Letter was indeed a reviewable "agency action" under the APA, the Court does not find a likelihood that Defendants' zero-dollar request was arbitrary, capricious, or an abuse of discretion. The Vought Letter itself notes a balance in the Bureau Fund in excess of $711 million. ECF No. 29-1, Ex. B. Defendants have presented evidence that, within the Bureau Fund, there was $412,346,065.32 in unobligated funds at the time Mr. Vought took office, including $220 million earmarked as a reserve fund and an unobligated operating balance of $192,346,065.32. *Id.* ¶ 8, Ex. A. "Before the Bureau's recent efficiency initiatives under Acting Director Vought," expenses were projected to be $132,100,000 for the third quarter of fiscal year 2025 and $132,000,000 for the fourth quarter. *Id.* ¶ 17. These projections are expected to decrease based on the new leadership's efforts to "increase efficiency and reduce waste" within the Bureau. *Id.* But the unobligated operating balance of $192,346,065.32 is more than enough to cover even the previous projection for the third quarter. Additionally, in making their determination that the funds presently available to the CFPB suffice to cover expenses for the third quarter, Defendants considered several relevant factors, including the current balances, future projections, and interests in efficiency and reducing government spending. *Id.* ¶¶ 9–10. Thus, Defendants' decision to request zero dollars from the Board of Directors for the third quarter is likely to fall "within a zone of reasonableness" and not likely to have been arbitrary, capricious, or an abuse of discretion. *Prometheus Radio Project*, 592 U.S. at 423, 141 S. Ct. at 1158.

The Court recognizes, as Plaintiffs point out, that the Bureau has in the past requested funding much closer to the statutory maximum amount it may receive from the Federal Reserve.[10] For example, in fiscal year 2024, when the Bureau was subject to a statutory cap of $785.4 million, then-Director Rohit Chopra requested $729.4 million on behalf of the Bureau. But, as noted in Part I.C *supra*, the Vought Letter is not the first time a CFPB head made a zero-dollar request from the Board of Governors. On January 17, 2018, under the first Trump administration, then-Acting Director Mick Mulvaney requested zero dollars from the Board of Governors for the second quarter of fiscal year 2018. ECF 29-2. Although, according to the Mulvaney Letter, the CFPB had a balance of $177.1 million in unobligated funds within its Bureau Fund at the time, Plaintiffs do not contend that Mr. Mulvaney's zero-dollar request prevented the Bureau from fulfilling its statutory obligations, harmed Plaintiffs in any way, or portended complete defunding of the Bureau.

Plaintiffs emphasize that the Vought Letter states an intention to "cut" the CFPB's Reserve Fund, which Mr. Vought describes as "excessive," and for the Bureau's new leadership to "do its part to reduce the federal deficit." ECF No. 29-1, Ex. B. In their briefing, Plaintiffs seem to construe these statements as reflecting a plan by Defendants to transfer the Bureau's Reserve Fund out of its own control, whether by returning it to Federal Reserve, sending it to the U.S. Treasury, or other means. Plaintiffs contend that any such plan by Defendants would be unlawful insofar as it jeopardizes the Bureau's ability to continue fulfilling its statutory obligations. But the Vought Letter's statements about cutting the "excessive" Reserve Fund and reducing the federal deficit are at least as likely to reflect a plan by Bureau leadership to spend down the Reserve Fund through

---

[10]     The amount that the CFPB may draw annually, since 2013, is subject to a statutory cap set at 12% of the Federal Reserve System's 2009 operating expenses, adjusted annually for inflation. 12 U.S.C. §§ 5497(a)(2)(A)(iii), (B).

the Bureau's ordinary operational expenses, rather than keep it in reserve while continuing to draw additional funds from the Federal Reserve to cover operating expenses. Indeed, in the same sentence, Mr. Vought states his plan to "run a substantially more streamlined and efficient bureau," ECF No. 29-1, Ex. B, which belies Plaintiff's allegation that he intends for the Bureau to be defunded to the point where it cannot operate at all. And in the same paragraph, Mr. Vought states that the Reserve Fund is neither required by statute nor necessary for the Bureau to fulfill its statutory mandate. *Id.* Here, Mr. Vought again acknowledges that the Bureau has a statutory mandate to fulfill, undermining the notion that the current leadership intends to ignore this mandate or impair the Bureau's ability to satisfy it by relinquishing its funds.

Notably, the same position was taken in the Mulvaney Letter: then-Acting Director Mulvaney found "no practical reason" for the Bureau to maintain "such a large reserve," considering its ability to request funding from the Board of Governors when necessary and the Board's consistency in granting such requests. ECF No. 29-2; *see also* 12 U.S.C. § 5497(a). The Mulvaney Letter goes on to state the then-Acting Director's "intent to spend down the reserve until it is of a much smaller size, while allowing the Bureau to successfully perform its functions, before making an additional request of the Board." ECF No. 29-2. The statements in the Vought Letter about cutting the Reserve Fund and reducing the federal deficit, while acknowledging the Bureau's operational mandate, are fully consistent with the Mulvaney Letter.

Moreover, according to Mr. Gueye and Mr. Martinez, the Bureau leadership has not sought to return any funds to the Federal Reserve or any other entity and is not aware of any mechanism for doing so. ECF No. 29-1, ¶ 16; ECF No. 39-2, ¶ 6. Plaintiffs characterize Mr. Gueye's statement about the CFPB's inability to return funds to the Federal Reserve as a red herring and cite Consent Orders issued by the CFPB that, Plaintiffs contend, reflect the Bureau's ability to transfer certain

27

funds to the U.S. Treasury. *See* Consent Order ¶ 80, *CFPB v. Goldman Sachs Bank USA*, No. 2024-CFPB-0011, 2024 WL 4925345 (CFPB Oct. 23, 2024).[11] In addition, at the hearing on their motion, Plaintiffs cited "the Bureau's unusual funding mechanism" through the Federal Reserve System, pointing out that money generated by the Federal Reserve "is actually not part of the normal budget." Feb. 26, 2025, Hr'g Tr. 26:12–16. Plaintiffs seem to suggest that, by stating an intention for the CFPB to "do its part to reduce the federal deficit[,]" ECF No. 29-1, Ex. B, Mr. Vought must intend to transfer the Bureau's Reserve Fund to the U.S. Treasury because merely spending down the funds held in reserve on operating expenses while opting not to request additional funding from the Board of Governors would not affect the federal deficit.

To the extent Plaintiffs intend to advance this argument, the Court disagrees. The Federal Reserve Act limits the amount of surplus funds held in the Federal Reserve banks and requires surplus amounts that exceed this limit to be transferred to the Board of Governors. 12 U.S.C. § 289(a)(3). In turn, the Board of Governors must transfer these surplus funds to the Treasury Secretary "for deposit in the general fund of the Treasury." *Id.* Therefore, declining to request additional funding from "the combined earnings of the Federal Reserve System," 12 U.S.C. § 5497(a)(1), in favor of spending down the CFPB's own Reserve Fund may reasonably contribute—however slightly—to a broader effort to reduce the federal deficit.

---

[11] The Court rejects any suggestion by Plaintiffs that Mr. Gueye's statement is purposefully evasive. His statement is directly responsive to *Plaintiffs'* allegation in their Complaint, "[o]n information and belief," that Mr. Vought "is seeking to transfer the Bureau's reserve fund back to the Federal Reserve." ECF No. 1, ¶ 40; *see also id.* ¶¶ 60, 66. This allegation is repeated in Plaintiffs' opening brief in support of their motion for preliminary relief. ECF No. 8-1 at 6, 10 n.12. Mr. Gueye's statement is framed in direct rebuttal to this allegation. Plaintiffs shifted the goalposts in their reply brief by alleging for the first time that Defendants might instead plan to transfer the CFPB's Reserve Fund to the U.S. Treasury or some entity other than the Federal Reserve. But Mr. Martinez states in his Supplemental Declaration that Mr. Gueye found "no authority or mechanism" to transfer excess funds to the Federal Reserve "or to the control of *any other entity*." ECF No. 39-2, ¶ 6 (emphasis added).

In sum, the Vought Letter offers, at best, scant support for the proposition that Defendants have made a final decision to discharge or relinquish the CFPB's control over funds available and necessary for its statutorily required operations.

### C.  Recent Activity at the CFPB

Plaintiffs argue that the Vought Letter must be viewed within the context of other recent actions taken by Defendants since Mr. Vought was appointed Acting Director of the CFPB and that, together, these actions reflect a final decision to defund the Bureau to a non-operational level. ECF No. 8-1 at 5–7; ECF No. 30 at 1–3. Plaintiffs point out that, in recent weeks, the Bureau's leadership instructed CFPB employees to stop working, closed the Bureau headquarters, discussed "winding down" the agency at a meeting on February 13,[12] and fired a substantial number of probationary and limited-term employees that week. ECF No. 8-1 at 5–6; ECF No. 30 at 2; ECF No. 36 at 1. Although these actions are consistent with an effort to drastically reduce the CFPB's operations, they are also consistent with stated goals of the Trump administration and current leadership of the CFPB to reduce spending and increase efficiency while maintaining the Bureau's statutory functions. *See* OMB/OPM Memo at 1–2; ECF No. 29-1, ¶ 17; *NTEU*, at ECF No. 31-1, ¶ 25. In either case, the aforementioned actions do not suggest that the current leadership intends to discharge control of the CFPB's operating funds and reserves. Notably, Bureau leadership has granted exceptions from the stop-work directive for employees to fulfill the Bureau's statutory functions. *NTEU*, at ECF No. 31-1, ¶¶ 19–23; *see also, e.g.*, *id.* at ECF No. 56-1 at 55–56. But

---

[12]    According to Mr. Martinez, the Bureau headquarters was closed due to concerns about safety and security surrounding protests outside of the building, and the closure of the headquarters "has not prevented the CFPB from performing [its] statutory functions" and "[t]he Bureau is committed to performing its statutory obligations . . . ." *NTEU*, at ECF No. 31-1, at ¶¶ 12–23, 28.

even if the current leadership intends to "wind down" the agency's operations, it would not need to relinquish control of its operating funds and reserves to accomplish that goal.[13]

In sum, the Court finds that recent operational decisions made at the CFPB, viewed in combination with other evidence, do not sustain Plaintiffs' unsupported claim that Defendants made a final decision or attempt to defund the Bureau.

### D. Political Opinions

Plaintiffs argue that statements made by Mr. Vought and President Trump in the media expressing their political opinions reflect a final decision by Defendants to defund the CFPB. Feb. 26, 2025, Hr'g Tr. 21:14–22:17. Specifically, Plaintiffs cite a statement by Mr. Vought on social media that, under prior leadership, the Bureau had been "a woke & weaponized agency against disfavored industries and individuals for a long time." Russ Vought (@russvought), X.com (Feb. 9, 2025) https://x.com/russvought/status/1888625239703110013. This statement does not evince a decision or intention to defund the Bureau. Next, Plaintiffs cite statements by President Trump that the CFPB was "set up to destroy some good people" and is "very important to get rid of." Allison Pecorin & Elizabeth Schulze, *Democrats vow to fight shutdown of consumer watchdog agency*, abcNEWS (Feb. 12, 2025) https://abcnews.go.com/Politics/democrats-vow-fight-shutdown-consumer-financial-protection-bureau/story?id=118716115 (last visited Mar. 13, 2025). But even assuming that the President's statements reflect a plan by the Trump administration to dissolve the Bureau, the Court cannot assume from these statements that the administration intends to dissolve it by defunding it out of operation. *See Trump v. New York*, 592

---

[13]    This Court takes no position on whether the record evidence amounts to an adequate showing that Defendants intend for the Bureau to cease operations. The question before this Court is whether a clear showing has been made that Defendants intend to discharge or relinquish control of its operating and reserve funds. The relief sought here is the enjoin any such action by Defendants. As explained herein, the Court finds that the requisite showing has not been made to justify the requested preliminary injunction.

U.S. 125, 131, 141 S. Ct. 530, 535, 208 L. Ed. 2d 365 (2020) (finding judicial review to be foreclosed by "contingencies and speculation" where the President has made only a general statement of policy, rendering any prediction as to how the policy might be implemented as "no more than conjecture") (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 108, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). To be clear, there are lawful means "to get rid of" the Bureau that do not involve discharging the funds presently available to the agency—*i.e.*, an act of Congress—and it is the President's prerogative to advocate for legislative action that reflects his policy preferences.[14]

Next, Plaintiffs cite Mr. Vought's involvement in *Project 2025*, a long-form policy agenda published by the Heritage Foundation in 2023. ECF No. 8-1 at 5. *Project 2025* describes the CFPB as "unconstitutional" and calls for Congress to "abolish" the Bureau. Heritage Foundation, *Project 2025: Presidential Transition Project, Mandate for Leadership: The Conservative Promise* 839 (Paul Dans & Steven Groves eds., 2023). The section of this publication on the CFPB does not appear to have been authored by Mr. Vought, but, even if it was, it does not advocate for wholesale defunding or dissolution of the Bureau by other unlawful means.[15] To the contrary, the relevant section sets out a legislative agenda for Congress to reform the Bureau. *Id.* The Court cannot

---

[14]     Plaintiffs also cite a social media statement by Mr. Musk, a senior advisor to the President, that CFPB's "money should be returned to taxpayers." Elon Musk, (@elonmusk), X.com (Feb. 10, 2025) https://x.com/elonmusk/status/1889005419273638392. But Mr. Musk is not a defendant in this action, and Plaintiffs offer no evidence or reason to believe that his political opinion binds the Bureau or reflects a final agency decision relinquish the Bureau's funds to the Treasury.

[15]     At the time *Project 2025* was published, a constitutional challenge to the CFPB's unique funding mechanism was pending before the U.S. Supreme Court in *CFPB v. Community Financial Services Association of America*, 601 U.S. 416, 144 S. Ct. 1474, 218 L. Ed. 2d 455 (2024). The document states that, if the Court affirmed the Fifth Circuit's holding that the Bureau's funding scheme violated the Appropriations Clause, then "the next conservative President should order the immediate dissolution of the agency . . . ." *Project 2025* at 839. Thus, the Court finding a constitutional violation may have justified "immediate dissolution" of the Bureau. It turns out, however, that the Court reversed in part the Fifth Circuit's decision and found the CFPB's funding structure to comply with the Appropriations Clause. *Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. at 435, 144 S. Ct. at 1486.

conclude from Mr. Vought's involvement with *Project 2025* that, as Acting Director, he has made a final decision or attempt to defund the CFPB out of operation.

### D.  Plaintiffs' Request for Limited Discovery

In the alternative to a preliminary injunction at this time, Plaintiffs, in their reply, make an alternative request for "limited expedited discovery" on Defendants' alleged decision to defund the CFPB. ECF No. 30 at 1. This request shall be denied.

Judges in this circuit have applied a "reasonableness" standard to requests for expedited discovery in connection with a preliminary injunction motion. *See L'Occitane, Inc. v. Trans Source Logistics, Inc.*, Civ. No. WMN-09-2499, 2009 WL 3746690, at *2 (D. Md. Nov. 2, 2009); *Chryso, Inc. v. Innovative Concrete Sols. of the Carolinas, LLC*, No. 5:15-CV-115-BR, 2015 WL 12600175, at *3 (E.D.N.C. June 30, 2015). Under this standard, the court will assess whether the request is reasonable or supported by good cause, "taking into account the totality of the circumstances." *L'Occitane*, 2009 WL 3746690, at *2 (citing *Dimension Data N. Am., Inc. v. NetStar-1, Inc.*, 226 F.R.D. 528, 531 (E.D.N.C. 2005)). Factors to consider may include

> the procedural posture of the case; (2) whether the discovery at issue is narrowly tailored to obtain information that is probative to the preliminary injunction analysis; (3) whether the requesting party would be irreparably harmed by waiting until after the parties conduct their Rule 26(f) conference; and (4) whether the documents or information sought through discovery will be unavailable in the future or are subject to destruction.

*Chryso*, 2015 WL 12600175, at *3.

Here, the Court does not find Plaintiffs' request to be reasonable or justified by good cause. First, Plaintiffs have not presented a narrowly tailored request. *See* ECF No. 30 at 1. More importantly, any request for materials reflecting the Bureau leadership's deliberations or mental state would violate "the general rule against inquiring into 'the mental processes of administrative

decisionmakers[,]'" and no clear showing has been made here of "bad faith or improper behavior[]" by Defendants. *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019). There is no indication that any relevant documents or information are subject to destruction or will be unavailable for future production, if warranted. *Chryso*, 2015 WL 12600175, at *3. For these reasons, Plaintiffs alternative request for expedited discovery is denied.

\* \* \* \* \*

Plaintiffs ultimately fail to make a clear showing that they will likely prevail in this action because they have not presented evidence of any final agency action by Defendants subject to challenge under the APA. Specifically, no showing has been made of any actual and final decision or attempt by Defendants to transfer away the CFPB's present operating and reserve funds such that the Bureau would be left without the funding it needs to fulfill its statutory mandate. No evidence has been presented to suggest that Defendants' decision-making process about the use of the Bureau Fund this fiscal quarter has been consummated, nor evidence that any concrete legal consequences have flowed from any such decision. *See Bennett*, 520 U.S. at 177–78, 117 S. Ct. at 1168. To the contrary, two CFPB officials attest that the Bureau leadership's efforts to increase efficiency and reduce waste are "ongoing" and have not resulted in any final decision as to how the funds available for the Bureau's operations will be spent. ECF No. 29-1, ¶ 17; NTEU, at ECF No. 31-1, ¶ 25. Without a clear showing of a "final agency action," *see* 12 U.S.C. § 704, the Court cannot find that Plaintiffs are likely to succeed on the merits of their APA claims.

As to ripeness, the Court has been presented with no evidence that any "formalized" decision by the CFPB's current leadership has affected Plaintiffs in any "concrete way." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 57; *Standage v. Braithwaite*, 526 F. Supp. 3d 56, 92. The limited record leaves this Court to conclude that any injury that might be caused by some future

arbitrary and capricious defunding of the CFPB is speculative, dependent upon future uncertainties, and therefore unfit for judicial decision. *See Scoggins*, 718 F.3d at 270 ("A case is fit for adjudication 'when the action in controversy is final and not dependent on future uncertainties.'") (quoting *Miller*, 462 F.3d at 319). The Court acknowledges and lauds Plaintiffs' mission to protect Maryland consumers in financial markets but finds no clear showing of an immediate threat to this worthy mission that would be redressed by enjoining Defendants in the use of their funds. Thus, the Court finds no clear showing that Plaintiffs' claims satisfy either the fitness or hardship prongs of the ripeness doctrine. *See, e.g.*, *Miller*, 462 F.3d at 319.

For the Court to intervene and entangle itself in the Bureau's administrative processes before the agency has made any final decision about the disposition of its operating and reserve funds—and without clear indication that an unlawful and injurious decision will be made imminently—would exceed the bounds of the Court's proper role and jurisdiction. It would be especially improper for the Court to risk exceeding its limited role on a preliminary basis.

For the foregoing reasons, Plaintiffs' motion for the "extraordinary" relief of a preliminary injunction must be denied. *See Winter*, 555 U.S. at 22, 129 S. Ct. at 376 (requiring "a clear showing that the plaintiff is entitled to [preliminary injunctive] relief). Entitlement to such relief does not require certainty that Plaintiffs will prevail, but it does require a clear demonstration that their success is likely. Plaintiffs fail to meet this standard. Without a likelihood of success on the merits, the Court need not reach the remaining *Winter* factors. *See Di Biase*, 872 F.3d at 230 (preliminary injunction requires "a clear showing that [plaintiff] is likely to succeed at trial"); *Vitkus*, 79 F.4th at 361 ("the failure of any single *Winter* factor" may justify "deny[ing] preliminary injunctive relief" without need to "fully evaluat[e] the remaining factors").

34

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order, ECF No. 8, construed by stipulation as a motion for a preliminary injunction, *see* ECF No. 17, shall be denied.

A separate Order will follow.


March 14, 2025                                   /S/
Date                                    Matthew J. Maddox
                                        United States District Judge